ELSIE T. MORRISON,            )
EMPLOYEE,                     )
PLAINTIFF                     )
              v              )              ORDER
BURLINGTON                    )
INDUSTRIES, EMPLOYER,         )
AND LIBERTY MUTUAL            )
INSURANCE                     )
COMPANY, CARRIER,
DEFENDANTS

No. 60

(Filed 23 October 1980)

THIS matter is before us on appeal from a decision of the North Carolina Court of Appeals reported in 47 N.C. App. 50, 266 S.E. 2d 741 (1980).

On 26 August 1976, plaintiff filed notice of accident and claim with the Industrial Commission, alleging that her exposure to cotton dust while working at Burlington Industries prior to 25 April 1974 had caused her to contract an *occupational disease*, byssinosis, resulting in permanent and total disability.

On 18 December 1978, Commissioner Brown entered an Opinion and Award finding that plaintiff was *totally disabled* for work *due to her exposure to cotton dust* while in defendant's employ. He entered an award accordingly. Defendants appealed to the Full Commission which modified Commissioner Brown's award. The Full Commission found that plaintiff does suffer from an occupational disease and is entitled to compensation but "that plaintiff *is not totally disabled by reason of such occupational disease*." (Emphasis added.) It found that, "In addition to her chronic obstructive lung disease, plaintiff suffers and has suffered for some time from phlebitis, varicose veins and diabetes. Such conditions constitute an added factor in causing her disability."

The Full Commission also entered the following finding of fact:

Due to the occupational disease suffered by plaintiff and due to her other physical infirmities, including bronchitis, phlebitis, varicose veins and diabetes, plaintiff has no earning capacity in any employment for which she can qualify in the labor market. Fifty-five percent of such disability is due to her occupational disease and 45 percent of such disability is due to her physical infirmities not related to her employment with defendant-employer.

The Commission thereupon awarded plaintiff 55% *partial disability* compensation for three hundred weeks pursuant to G.S. 97-30.

Plaintiff appealed to the Court of Appeals which reversed the Full Commission. The Court of Appeals held that the employee was totally incapacitated for work due to a compensable occupational disease and was entitled to an award for total incapacity under G.S. 97-29. Chief Judge Morris dissented on the ground that an employee should be compensated only for incapacity "resulting from the injury," and not for "factors totally unrelated to her employment."

On 7 July 1980, defendants appealed to this Court pursuant to G.S. 7A-30. We heard oral arguments on 13 October 1980. We do not express any opinion on the merits in this order. For reasons stated below, we remand to the Industrial Commission for further hearing on the medical evidence, direct that a record of the proceedings on remand be forwarded to this Court forthwith and retain jurisdiction for our final determination on the merits.

We note herewith a summary of the medical testimony.

Dr. Mabe testified, *inter alia*, as follows:

On September 3, 1975, she had a persistent bronchitis, chronic fibrosis of the lungs and concomitant phlebitis of the left leg . . . .

. . . .

. . . Based on my physical examination and taking a history on her admission, she was admitted to the hospital with a working diagnosis of a recent upper respiratory infection superimposed on chronic bronchitis, diabetes mellitus, controlled by diet; and suspected byssinosis, occupational oriented. The final impression was chronic bronchitis, severe, diabetes mellitus, controlled by diet; possible byssinosis with history of exposure to lint, aggravated by upper respiratory infections and productive cough.

. . . .

. . . [T]he medical bases for her disability were chronic bronchitis, phlebitis of the left leg with some brown edema, maxillary sinusitis, and, of course, chronic pulmonary obstructive disease were the primary things as far as working was concerned. She did have a leg problem with old residual which would not have totally disabled her but it was an added factor to her disability. . . .

. . . . .

I have treated her multiple times for respiratory infections, with sinusitis involved in it. In 1965, she did have a lot of respiratory infections, but this was a different season of the life and different age. She was treated on multiple occasions for bronchitis, cough. I did not treat her originally for the phlebitis. That was a residual and more current thing, but before she retired, she was treated for a chronic, persistent cough, which we labelled as a bronchitis.

. . . .

. . . She had a leg problem too, which kept her from doing anything with any walking any length of time, or standing. This was another problem, and was an additive factor as far as her maintaining a job of some other character.

Dr. Sieker testified, *inter alia*, as follows:

Pulmonary function studies showed lung capacity 85% of normal but with severe obstruction of the bronchial tubes so that arterial oxygen is 62. Her arterial oxygen normally is 80 and with exercise, it is only 71, so she has severe respiratory disability.

.   .   .   .

.   .   . She had mild diabetes and phlebitis in her leg.

.   .   .   .

.   .   . She smoked about a half a pack of cigarettes a day for 20 years and less in recent years. .   .   .

.   .   .   .

.   .   . Based upon all the foregoing, my opinion satisfactory to myself to a reasonable degree of medical certainty, with the history of long exposure, is that the plaintiff's cotton dust exposure is most likely a causative factor in her chronic lung disease.

Again, based upon the same report and facts, my opinion, satisfactory to myself to a reasonable degree of medical certainty, is that the plaintiff's disability is due to her chronic lung disease. .   .   .

.   .   .   .

I did get a history of smoking. At the maximum, she smoked a half pack a day and by her history, and she decreased this amount, although she was still smoking at the time I saw her. I noted that she had a "small nodular density in the periphery of the right lung." It is hard to say from the x-ray exactly what caused it, but usually this represents previous inflammatory disease, most likely fungus or TB.

.   .   .   .

. . . Based on the other conditions that Mrs. Morrison has had, I would have to say that weighing the cotton dust exposure, somewhere between 50 and 60% of her disability would be related to her cotton dust exposure. Therefore, 50-40% was due to factors other than the cotton dust exposure.

Dr. Battigelli testified, *inter alia*, as follows:

If the Commission should find that Mrs. Morrison is either totally or partially disabled, my opinion, satisfactory to myself to a reasonable degree of medical certainty, as to what percentage of her disability which can be traced or is due to her exposure to cotton dust is that it could be quite miniscule, if not negligible. With luck, between 0 and 20%, in percentage terms.

. . . .

In my report I indicate a diagnosis of chronic obstructive lung disorder, bronchitis in type, in cigarette smoker with aggravation of complaints, on dust exposure.. . . As to the question of what effect aggravation on dust exposure would have over a period of twenty-eight years in terms of a clinical picture which she presented in 1975, I don't have any rational evidence to reply to that. I would state that does not necessarily mean that this temporary aggravation may result in a chronic one.

. . . I am unable to quantitate the effect of aggravation on cotton dust exposure over twenty-eight years; I can quantitate the effect of cigarette smoking. The statistical evidence shows that the damage of cigarette smoking is proportional to dose. There is similar data with respect to dose response in terms of cotton dust exposure. In a much less persuasive fashion, there is some analogy.

. . . .

Assuming that the Commission would find as fact that Mrs. Morrison, some ten or twelve years before her retire-

ment after working a substantial number of years in textile employment, exposure to cotton dust, began to notice symptoms of cough and chest tightness at work as opposed to weekend, that would occur soon after her return to work on Sunday evening, assuming they were the facts in this particular case, assuming that the evidence that I had not been able to gather was presented to me, talking about hypothetical — then the diagnosis would be different. A label of byssinosis could be legitimately used; otherwise, it is a fraud. But if that evidence is collected, then you could use it. The question that remains to define is what that label may imply in terms of disability.

. . . And I would be happy to support her in her claim [for Social Security] on the grounds of — number one, severe venous insufficiency; number two, chronic obstructive lung disorder; number three, depression; and number four, status post surgery.

I believe I also indicated that she presented valid symptoms of dyspenea on exertion in relation to those problems, which is evidence of chronic obstructive lung disorder and is one of the most common factors in dyspenea.

From the record, we conclude that the medical evidence before the Commission is not sufficiently definite on the cause of plaintiff's disability to permit effective appellate review. As we read the medical testimony, the physicians never addressed the crucial medical question of the interrelations, if any, between the cotton dust exposure and claimant's other infirmities such as her bronchitis, upper respiratory infection, sinusitis, phlebitis, and diabetes. In order for this Court to determine if the Commission's findings and conclusions are supported by the evidence, the record, through medical testimony, must clearly show: (1) what percentage, if any, of plaintiff's disablement, i.e., incapacity to earn wages, results from an occupational disease; (2) what percentage, if any, of plaintiff's disablement results from diseases or infirmities unrelated to plaintiff's occupation which were accelerated or aggravated by plaintiff's occupational disease; and (3) what percentage, if any, of plaintiff's disablement is due to diseases or infirmities unrelated to

plaintiff's occupation which were *not* accelerated or aggravated by plaintiff's occupational disease.

For example, it is obvious that the Commission relied on Dr. Sieker's percentages in its finding of fact quoted above. However, Dr. Sieker never testified what he meant by "factors other than cotton dust exposure." Did he mean simply the phlebitis, or did he mean also to refer to claimant's bronchitis, upper respiratory infection, sinusitis, phlebitis, and diabetes? Could her cotton dust exposure have aggravated, contributed to or accelerated any of these other conditions; if so, which ones? If claimant is partly disabled by conditions which are caused, aggravated or accelerated by breathing cotton dust, then what percent of her disability is caused by these conditions? If claimant is partly disabled by conditions which are neither caused, aggravated nor accelerated by breathing cotton dust, then what percentage of her disability is caused by these conditions?

This Court does not abandon the well-established rules in this jurisdiction that the Industrial Commission has the exclusive duty and authority to find the facts relative to disputed claims and such findings are conclusive on appeal when supported by any competent evidence. Moreover, where the evidence before the Commission is such as to permit either one of two contrary findings, the determination of the Commission is conclusive on appeal and the mere fact that an appellate court disagrees with the findings of the Commission is not grounds for reversal. Here, however, the medical evidence before the Commission which appears in the record before us is not sufficiently definite to permit appropriate appellate review.

We cannot evaluate the testimony quoted above and correctly determine whether the findings made by the Commission are supported by the evidence. For that reason, we direct the Commission to re-examine the three medical witnesses to elicit definite answers to the questions noted above.

The Commission will then make findings of fact based thereon. If those findings require legal conclusions and an award at variance with those heretofore made by the Commis-

Morrison v. Burlington Industries

sion, it will then make appropriate legal conclusions and order the issuance of an award based thereon. If the additional findings require no change, the Commission will leave its conclusions and award intact. The additional findings of fact together with amended conclusions and award, if any, and a transcript of the additional medical evidence, will be certified to this Court forthwith and treated as an addendum to the record. Copies shall be forwarded to all parties for such further proceedings in this Court as may then be ordered.

It is so ordered.

Remanded to the Industrial Commission for further proceedings consistent with this order.

Jurisdiction retained by this Court for final determination.

This order shall be printed in the official reports of decisions of this Court.

Done by the Court in conference this 23rd day of October, 1980.

CARLTON, J.
For the Court.

The foregoing order is issued over my hand and the seal of the Supreme Court this 24th day of October, 1980.

John R. Morgan
Clerk of the Supreme Court
of North Carolina