STATE OF NORTH CAROLINA v. ROBERT HENRY McDOWELL

No. 195A82

(Filed 10 January 1984)

1. **Constitutional Law § 30— failure of prosecution to disclose evidence—due process**

   The prosecution's failure to disclose evidence to the defense before trial may result in a deprivation of constitutional due process requiring a new trial where (1) the prosecution bases its case, in part, on testimony which it knew or should have known was perjured; (2) defendant requests, prior to trial, specific, material evidence favorable to the defense which is in the hands of the prosecution but which the prosecution fails to produce; or (3) the prosecution withholds material evidence favorable to defendant in the absence of a specific request from defendant for that evidence.

2. **Constitutional Law § 30— failure of prosecution to correct false testimony**

   The passive failure of the prosecution to correct what it knows or should know is false testimony constitutes the knowing use of false evidence. However, in this case it cannot be said that the testimony of a witness about her descriptions of her assailant given to an SBI agent and her testimony that she had only seen defendant once before was false so that the prosecution had a duty to correct it.

3. **Constitutional Law § 30— failure of prosecution to disclose unrequested evidence—collateral attack—standard for determining materiality**

   The proper standard to determine whether on collateral attack unrequested evidence known but not disclosed by the prosecution is material so that due process requires that defendant be given a new trial is: Would the evidence, had it been disclosed to the jury which convicted defendant, and in light of all other evidence which that jury heard, likely have created in the jury's mind a reasonable doubt which did not otherwise exist as to defendant's guilt?

4. **Constitutional Law § 30— failure of prosecution to disclose evidence—new trial based on improper legal conclusions**

   The trial court's order granting defendant a new trial because of the failure of the prosecution to reveal certain information to defendant was not supported by appropriate legal conclusions where it was based upon conclusions that the prosecution's failure to disclose "raise[d] . . . constitutional and due process questions" and that a lower federal court might require "a new trial at some distant future."

5. **Criminal Law § 177.2— new explication of legal standard—remand for reconsideration**

   When findings of fact must be made in light of a prevailing legal standard, a new explication of the standard by the Supreme Court justifies a remand of the case for reconsideration *de novo* based upon the new explication.

Justice FRYE did not participate in the consideration or decision of this case.

DEFENDANT'S motion for appropriate relief was allowed by *Judge Collier* on 5 December 1981, following an evidentiary hearing conducted at the 26 August 1981 Session of LEE Superior Court. After dismissing the state's purported appeal, we allowed the state's petition for writ of certiorari on 4 May 1982.

*Rufus L. Edmisten, Attorney General, by Donald W. Stephens, Assistant Attorney General, for the state appellant.*

*Richard A. Rosen and Patricia W. Lemley, UNC School of Law; James E. Ferguson; John Charles Boger, admitted pro hac vice, and Deborah Fins, for defendant appellee.*

EXUM, Justice.

The question dispositive of this case is whether Judge Collier entered the order allowing defendant's motion for appropriate relief without applying the appropriate constitutional standard. Believing that he did, as the state contends, we vacate his order and remand the case to the superior court for a hearing *de novo*.

I.

The movant, Robert Henry McDowell, was convicted of first degree murder and felonious assault at the 3 December 1979 Criminal Session of Johnston Superior Court, Judge Smith presiding. After a sentencing hearing, the jury recommended that a sentence of death be imposed; the court entered judgment accordingly. Defendant was sentenced to twenty years' imprisonment on his felonious assault conviction. This Court found no error in either the guilt or sentencing phases of the trial proceedings. *State v. McDowell,* 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied,* 450 U.S. 1025, *reh'g denied,* 451 U.S. 1012 (1981).

On 19 May 1981 defendant filed a motion for appropriate relief, including a motion for stay of execution,[1] pursuant to Ar-

---

1. Upon the United States Supreme Court's denial of McDowell's petition for rehearing, this Court on 21 May 1981 terminated its stay of McDowell's execution. The execution was thereafter rescheduled for 5 June 1981 pursuant to G.S. 15-194 (1978) (current version of G.S. 14-194 codified in Cum. Supp. 1981).

State v. McDowell

ticle 89, Chapter 15A of the General Statutes. On 1 June 1981 Judge Farmer, presiding in Johnston Superior Court, allowed McDowell's motion to stay his execution pending further order of the court. On 6 August 1981 Judge Bowen, on the state's motion, transferred all matters then pending to Lee County where the case had arisen.[2]

Judge Collier heard defendant's motion for appropriate relief during the 24 August 1981 Criminal Special Session of Lee Superior Court. On 8 December 1981, Judge Collier awarded defendant a new trial. Judge Collier based his order for a new trial on his conclusion that the prosecution's failure to disclose certain information to defendant before or during his trial "raise[d] sufficient constitutional and due process questions" to make it likely a federal court will require "a new trial at some distant future date." After careful consideration of the order and the factual background upon which it rests, we conclude the order must be set aside and a new hearing had on defendant's motion for appropriate relief as amended. The order must be vacated because Judge Collier did not apply appropriate constitutional standards to his factual findings, an application which the trial court in the first instance should make.

Defendant filed his original motion for appropriate relief pursuant to N.C. Gen. Stat. § 15A-1415 (1978) *as amended in* § 15A-1415 (1981 Cum. Supp.). In it he relied entirely on the following portions of that statute:

(3) The conviction was obtained in violation of the Constitution of the United States or the Constitution of North Carolina.

(4) The defendant was convicted or sentenced under a statute that was in violation of the Constitution of the United States or the Constitution of North Carolina.

.  .  .  .

(6) Evidence is available which was unknown or unavailable to the defendant at the time of the trial, which could not

2. Defendant's first trial was held in Lee County but ended in a mistrial. Thereafter, the case was transferred to Johnston County where defendant was tried, convicted and sentenced.

State v. McDowell

with due diligence have been discovered or made available at that time, and which has a direct and material bearing upon the guilt or innocence of the defendant.

His original motion alleges: (1) constitutional errors in the jury selection process; (2) his death sentence was so arbitrarily imposed as to be in violation of the Eighth and Fourteenth Amendments to the United States Constitution; (3) failure to record the jury selection process violates the Sixth, Eighth and Fourteenth Amendments of the United States Constitution; (4) N.C. Gen. Stat. § 15A-2000 is unconstitutional; and (5) he was deprived of his right to effective assistance of counsel for the reason that his trial counsel did not adequately raise or explore the possibility of an insanity defense.

On 7 July 1981 defendant moved to amend his motion so as to allege his entitlement to a new trial under subsection (b)(6) of the statute, i.e., newly discovered evidence. Defendant alleged that the newly discovered evidence consisted in part of the following: The state's only eyewitness to the crimes, Patsy Mason, had been well acquainted with defendant before the crime, although she told the jury she had seen him previously only one time and did not know him. Patsy Mason initially reported that her assailant was a white man, although defendant is black.

Upon these additional factual allegations, defendant contended he was entitled to a new trial on these grounds: (1) denial of effective assistance of trial counsel because of counsel's failure to discover the new evidence before trial; (2) denial of due process because of the state's failure to disclose this evidence; (3) deprivation of his Sixth Amendment right to confrontation and to a fair trial because of certain errors in evidentiary rulings by the trial court; and (4) violation of due process by the introduction of "irrelevant and gory photographs" at trial.

Defendant presented evidence before Judge Collier, however, solely to show: (1) newly discovered evidence; (2) denial of due process by the state's failure to disclose exculpatory evidence; and (3) excuse of one juror for cause at the guilt phase of trial because of her opposition to the death penalty.

At the close of the hearing, Judge Collier allowed the state and defense counsel time to submit written briefs. On 8 December

1981 Judge Collier entered a judgment awarding defendant a new trial. His order stated in pertinent part:

. . . .

3. Uncontradicted evidence at the hearing disclosed that information was contained in a police file that the only surviving eyewitness made a statement at the hospital in the emergency room shortly after her injury in response to a question about the race of her assailant that he was 'white.' This information was not specifically asked for nor voluntarily disclosed to the defendant's attorneys prior to or during the trial. The defendant is black. The witness was severely injured and apparently near the point of death from gashes to her face and head and about her body and unable to respond to other questions thereafter put to her at that time. Due to the serious question of her capacity at the time of the response as indicated by the evidence, its effect, if any, on the jury, is impossible to predict.

4. The witness was permitted to convey an impression to the jury that she had seen the defendant on only one previous occasion and then for a very brief period of time when the prosecution had information that she had been in the presence of the defendant on at least several previous occasions, knew him to some extent, and had talked with and danced with him.

5. Information about two recent prior alleged invasions of the victim's house by intruders of a different race than defendant which were reported to but unsubstantiated by police investigation was not disclosed to defendant's attorneys.

6. Information about a young person seeing a person on a white bicycle enter the front door of the house around 11:30 p.m. on the night of the attack was not disclosed to defendant's attorneys.

7. Information that eyewitness had given conflicting descriptions to the SBI while in the hospital was never disclosed to defendant's attorneys.

8. While the individual items of undisclosed information standing alone might be insufficient to be exculpatory under

all the circumstances attendant in the case and the separate incidents in themselves might not be sufficient to require a new trial, the cumulative effect of them all *raise sufficient constitutional and due process questions* especially in view of the fact that this is a capital case where the death sentence has been imposed and the conviction affirmed by the highest court of our state *and the substantial likelihood of a federal court requiring a new trial at some distant future date* after the existing evidence has grown even colder and memories dimmer and after the expenditure of what would otherwise be many thousands of dollars. Consequently, the ends of justice require awarding the defendant a new trial at the earliest reasonable time.

9. The question of guilt or innocence was not before this court and therefore not a proper consideration at this hearing. Every person charged with any crime, no matter how heinous or atrocious, is entitled to a fair trial that comports with the constitution and laws of our state and nation. The principles of law that occasionally shield those who have committed dastardly acts are the same principles of law that protect the innocent and us all from oppression and tyranny. To disregard these principles under any circumstances would be a violation of much that we stand for and that for which many have given their lives to preserve.

10. This decision was not entered into lightly nor without many hours of research and study of the evidence at the hearing, the briefs, the law, the trial transcript and the oral arguments. The decision is not intended to be critical of anyone connected with this case or its appeal. The matters and things on which this decision is based largely came to light only after the conviction of the defendant and after the conviction was affirmed by the Supreme Court. The undisclosed information was not deliberately withheld from the defendant's counsel but was either unknown to the prosecution or considered in good faith to be unexculpatory and therefore not required to be disclosed. [Emphasis supplied.]

Judge Collier did not address defendant's evidence relating to the excuse for cause of a trial juror nor did he address defendant's contention that he was entitled to a new trial for newly

discovered evidence under N.C. Gen. Stat. § 15A-1415. Defendant took no exception and made no cross assignments of error directed to these omissions. App. R. 10(d). Judge Collier ruled defendant was entitled to a new trial solely because of the prosecution's failure to disclose certain evidence in its possession to defendant before trial. We allowed the state's petition for certiorari to review the correctness of this ruling. This being the only question properly before us, we now address it.

## II.

[1] In three situations, the prosecution's failure to disclose evidence to the defense before trial may result in a deprivation of constitutional due process requiring a new trial. In the first situation, the prosecution bases its case, in part, on testimony which it knew or should have known was perjured. *Napue v. Illinois*, 360 U.S. 264 (1959); *Mooney v. Holohan*, 294 U.S. 103 (1935). In the second situation, defendant requests, prior to trial, specific, material evidence favorable to the defense, which is in the hands of the prosecution but which the prosecution fails to produce. *Brady v. Maryland*, 373 U.S. 83 (1963). In the third situation, the prosecution withholds material evidence favorable to defendant in the absence of a specific request from defendant for that evidence. *United States v. Agurs*, 427 U.S. 97 (1976).

[2] Defendant contends this case falls in categories one and three, *i.e.*, the prosecutor knowingly used perjured testimony and the prosecution withheld unrequested material evidence. Defendant correctly states that the passive failure of the prosecution to correct what it knows or should know is false testimony constitutes the knowing use of false evidence.

> [I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence allows it to go uncorrected when it appears.

*Napue*, 360 U.S. at 269. Defendant argues the state knowingly failed to correct certain testimony of Patsy Mason which it knew to be false. Defendant points specifically to Patsy's testimony about her descriptions of her assailant given to SBI Agent Scheppf and her testimony which created an "impression" she had only seen defendant once before.

Defendant argues that Patsy testified she told Agent Scheppf her assailant had "flat hair," when in fact she had described him as wearing a "bushy Afro." According to Agent Scheppf, however, Patsy gave several different descriptions. One of these descriptions was that her assailant had "short dark hair." Later, Patsy gave the "bushy Afro" description from which a composite drawing was made. Therefore, Patsy did not testify falsely when she said she had described her assailant as having "flat hair," which is, we believe, reasonably consistent with "short-hair." At least the difference in the two descriptions is not enough to establish that the witness is testifying falsely.

Patsy was also cross-examined as follows:

Q. Did you give her [Agent Scheppf] any other description?

A. What he was wearing.

Q. What did you say that he was wearing?

A. A dark pullover shirt and blue jeans.

Q. Now, did you notice the shoes that this person was wearing?

A. No.

Q. So you didn't describe those to her.

A. No.

Again, Patsy's testimony on this point was not false. It was consistent with a further description she had, in fact, given Agent Scheppf. Patsy never testified that the descriptions she testified about were the only descriptions she ever gave. That question was never put to her.

Finally, both the state and defendant knew before trial of witnesses who claimed they had seen Patsy and defendant "socializing" at several different nightspots, and both the state and defendant decided not to call these witnesses at defendant's trial. The mere existence of such witnesses does not establish that Patsy's testimony that she had seen defendant only once at an advancement center was perjurious. We cannot know, of course, whether Patsy or the witnesses who were never called are telling the truth about this fact.

This case, therefore, falls only into the third category set out above—failure of the prosecution to reveal certain unrequested evidence in its possession.

Upon a challenge regarding the prosecution's failure to disclose nonrequested evidence, the central inquiry involves the materiality of the withheld evidence. An assessment must be made of the impact which that evidence would have had on the determination of defendant's guilt, for "[s]uch a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt." *Agurs*, 427 U.S. at 112. The somewhat elusive gauge used to measure the materiality of this nondisclosed evidence becomes the focus of the post-trial analysis. This analysis of materiality involves two basic questions: (1) What constitutes material evidence and (2) by whose eyes must this materiality be judged—the jury or trial judge? We consider each question *seriatim*.

## A.

In *Agurs*, the Court did not define what standard of materiality applies to this third type of case. Rather, it explained two standards which did not apply. First, defendant need not establish that the "evidence probably would have resulted in acquittal." *Id.* at 111. In other words, defendant does not shoulder this very heavy burden generally required to obtain a new trial under Rule 33 of the Federal Rules of Criminal Procedure. *See generally United States v. Thompson*, 493 F. 2d 305, 310 (9th Cir. 1974), *cert. denied*, 419 U.S. 834 (1975) (defining the burden for establishing grounds for a new trial based on newly discovered evidence under Rule 33).

Second, defendant must demonstrate more effect on the trial than that required by the harmless-error standard. *Agurs*, 427 U.S. at 112. Under that more lenient approach, defendant's burden is only to satisfy the reviewing court that it cannot be certain "that the error did not influence the jury, or have but very slight effect . . . ." *Kotteakos v. United States*, 328 U.S. 750, 764 (1946) (defining the harmless-error standard).

These two standards of materiality, each rejected by *Agurs*, represent the two extremes in the range of standards which could apply to nonrequested, undisclosed evidence. *See* Babcock, *Fair*

*Play: Evidence Favorable to an Accused and Effective Assistance of Counsel,* 34 Stan. L. Rev. 1133, 1175 (1982). The standard to be applied, unarticulated in *Agurs,* falls somewhere between these two extremes. *Agurs* did, however, provide at least a general description of a rule with which courts may assess the materiality of undisclosed evidence.

> It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Agurs,* 427 U.S. at 112-13 (footnotes omitted). This standard reflects a fluctuating, flexible mode of evaluation. Rather than adopting a precise, rigid standard, the Court elected to provide reviewing courts with a general statement to guide them as they weigh the facts and sift the circumstances of particular cases. Between the obviously opposite poles of "no reasonable doubt about guilt whether or not the additional evidence is considered" and verdicts "already of questionable validity," lies a broad "inevitably imprecise," *id.* at 108, area. *Agurs* responded to the imprecise nature of possible situations by providing an imprecise standard of materiality, *i.e.,* something more than a slight effect on the jury's decision but less than having a determinative effect.

While *Agurs* left open the precise standard which a court in post conviction proceedings should use in assessing the effect of undisclosed evidence, we feel compelled to articulate a standard for trial judges in North Carolina within the bounds permitted by *Agurs.* Little uniformity can be achieved in these matters, either by the initial judgments of trial judges or by appellate review, if no consistent standard exists to govern decisions at both levels.

In establishing this standard, we recognize that *Agurs* refers consistently to the notion of whether the undisclosed evidence creates a reasonable doubt. *Id.* at 112-13. An appropriate standard of materiality should incorporate this notion. If the evidence creates a reasonable doubt as to guilt, then due process requires

that a defendant receive a new trial.[3] *Agurs* recognizes as much. The imprecise area which needs clarification is: How strong must the likelihood be that the undisclosed evidence would have created a reasonable doubt?

The answer lies between the two extremes noted in *Agurs*: that the court on post conviction review believes the evidence probably would have resulted in an acquittal, on one extreme, and, on the other, that the reviewing court does not believe with certainty that the evidence would not have affected the jury. We feel the middle ground between these two extremes can best be articulated by, and therefore we adopt as our standard, this formula: Would the undisclosed evidence likely have created a reasonable doubt on the issue of guilt which did not otherwise exist.[4]

The evaluation of the effect of the nondisclosed evidence and, hence, its materiality, hinges on two factors: (1) The strength of the evidence itself vis-a-vis the issue of guilt[5] and (2) the magni-

---

3. We are not unmindful of our recent decision which explicated the process involved in establishing constitutional error sufficient to justify granting a motion for appropriate relief. *State v. Bush,* 307 N.C. 152, 297 S.E. 2d 563 (1982). In *Bush,* we noted that our statutes place the initial burden on a defendant to establish that constitutional error was committed. *Id.* at 166-67, 297 S.E. 2d at 572-73. Once constitutional error is established, a defendant is entitled to appropriate relief (usually in the form of a new trial) unless the state persuades the courts the error was harmless beyond a reasonable doubt. *Id.* at 167, 297 S.E. 2d at 573. N.C. Gen. Stat. § 15A-1443(b) (1978). Once a defendant establishes, through the process outlined herein, an *Agurs* violation, he is entitled to a new trial. An *Agurs* violation is, by its very nature, an extraordinary type of constitutional error. Since a defendant must show, as a basis for constitutional error under *Agurs,* that the undisclosed evidence would likely have created a reasonable doubt at his trial, this error cannot be harmless beyond a reasonable doubt. Essentially, in this situation, a defendant establishes both that constitutional error has been committed and that it was not harmless. Indeed, he must establish the latter as a prerequisite to establishing the former.

4. We acknowledge that the standard could be formulated in terms of whether "the evidence would likely have affected the outcome of the trial." We see no distinction between "affected the outcome of the trial" and "created a reasonable doubt." Criminal verdicts are based on the presence or absence of reasonable doubt. We assume, as we must, that a guilty verdict results only when the evidence supports it beyond a reasonable doubt. If the undisclosed evidence, taken in light of the record as a whole, does not alter the nonexistence of reasonable doubt, then it could not have affected the outcome of the trial.

5. For example, evidence tending solely to impeach a nonmaterial government witness would have little or no strength on the issue of guilt, while evidence that

tude of the evidence of guilt which the convicting jury heard. Accordingly, the reviewing court must view the additional evidence in light of the evidence used to convict defendant in determining whether it would likely have created a reasonable doubt as to a defendant's guilt.

### B.

We now consider the second problem posed by reviews of nondisclosed evidence. Specifically, we must decide upon whom the effect of the additional evidence must be measured, the trial judge hearing the post-conviction proceeding or the jury. The universal view is that the answer which *Agurs* provides is ambiguous. *See Ostrer v. United States,* 577 F. 2d 782, 788, n. 5 (2d Cir. 1978), *cert. denied,* 439 U.S. 1115 (1979); *Cannon v. State of Alabama,* 558 F. 2d 1211, 1216, n. 11 (5th Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978); Babcock, *supra,* at 1179. While the opinion is not altogether clear, we do not find it completely ambiguous on this issue.

The *Agurs* Court did not explicitly declare upon whose mind the effect of the additional evidence must be measured.[6] Yet we glean some feeling for the Court's judgment from the overall thrust of the majority opinion. The Court clearly expressed concern for the need to find guilt only upon proof "beyond a reasonable doubt." 427 U.S. at 112. It based the requirement that exculpatory evidence, although unrequested, must be disclosed upon the need to preserve a defendant's right to a fair trial under

---

another person's fingerprints were on the murder weapon would have tremendous bearing on that issue. *See United States v. Agurs,* 427 U.S. 97, 111, n. 18 (1976).

6. The references by the *Agurs* majority that "the trial judge indicated his unqualified opinion that respondent was guilty" and "the trial judge remained convinced of respondent's guilt beyond a reasonable doubt . . ." do not suggest to us that the effect should be measured by the trial judge's judgment rather than the jury's. First, the trial judge in *Agurs* used the jury as the guide. In evaluating the impact of the additional evidence, he expressed "skepticism that [it] would have made any difference in the jury's conclusions." *United States v. Agurs,* 510 F. 2d 1249, 1251 (D.C. Cir. 1975), *reversed,* 427 U.S. 97 (1976). Second, the Supreme Court rejected the circuit court's conclusion that "the jury might have returned a different verdict if the evidence had been received," 427 U.S. at 102, not because of its view of the evidence's effect *on the jury* but because of the standard of materiality through which the Court of Appeals evaluated the evidence, *i.e.,* that the jury verdict *might* have been different. *See id.* at 112 (where the Court rejects the lenient, harmless-error standard). Finally, the trial judge in *Agurs* was the same judge who presided over Agurs' initial trial.

the Due Process Clause of both the Fifth and Fourteenth Amendments. *Id.* at 107. And throughout its analysis, it underscored the central importance of assessing the character of the nondisclosed evidence in judging its effect on a defendant's conviction. *Id.* at 110. All of these factors—burden of proof, need for all exculpatory evidence, and a fair trial—are linked to the factfinder. It is the factfinder who must ultimately hear this material evidence; it is only the factfinder upon whom the material evidence could make a difference.

The crucial question involved in these cases is the effect of the evidence on the outcome of the trial. *United States v. DiFrancesco,* 604 F. 2d 769, 774 (2d Cir. 1979), *rev'd on other grounds,* 449 U.S. 117 (1980). The outcome rests, of course, in the hands of the factfinder. Logically, then, it is the factfinder upon whom the effect of this undisclosed evidence should be measured. Our interpretation of the reasoning in *Agurs* leads us to conclude that the undisclosed evidence must be viewed in terms of its effect on the jury. Since the jury determines guilt or innocence based solely on its evaluation, and its evaluation alone, of the evidence, reviewing courts must assess the undisclosed evidence as it would likely impact upon the jury. We join a number of federal courts of appeals in this conclusion. *See, e.g., United States v. Librach,* 609 F. 2d 919, 921-22 (8th Cir. 1979), *cert. denied,* 444 U.S. 1080 (1980); *Ostrer,* 577 F. 2d at 788; *Cannon,* 558 F. 2d at 1214. Furthermore, we feel this result is particularly appropriate in North Carolina where, unlike the federal system, the judge who considers a post trial motion for appropriate relief is most often not the judge who tried the case.

### III.

[3]  The proper standard, therefore, which we adopt to determine whether on collateral attack unrequested evidence known but not disclosed by the prosecution is material so that due process requires defendant be given a new trial because of its nondisclosure is this: Would the evidence, had it been disclosed to the jury which convicted defendant, and in light of all other evidence which that jury heard, likely have created in the jury's mind a reasonable doubt which did not otherwise exist as to defendant's guilt?

## IV.

The inquiry is essentially a legal one and the answer to the question constitutes a conclusion of law fully reviewable on appeal where the question will be whether the facts found are supported by the evidence and, in turn, support the conclusion. Nevertheless, the conclusion of law must be based on a careful evaluation and assessment of all the facts, both those presented at defendant's trial and the undisclosed facts which are the subject of the motion for post conviction relief. Because the conclusion is based upon such a careful assessment of the facts, and actually constitutes the application of a standard to the facts, we believe it is appropriate to hold that the conclusion should, in the first instance, be made by the trial court which hears the evidence presented on the post conviction motion for appropriate relief.

[4] Judge Collier's order is not supported by appropriate legal conclusions, nor did he apply the standard which we today articulate. It is not enough to conclude as he did that the prosecution's failure to disclose "raise[s] . . . constitutional and due process questions . . . ." The question is whether such a failure deprived defendant of constitutional due process. Neither is it sufficient, or even appropriate, to base an order on a conclusion that a lower federal court might require "a new trial at some distant future date. . . ." State courts are no less obligated to protect and no less capable of protecting a defendant's federal constitutional rights than are federal courts. In performing this obligation a state court should exercise and apply its own independent judgment, treating, of course, decisions of the United States Supreme Court as binding and according to decisions of lower federal courts such persuasiveness as these decisions might reasonably command. In fairness, Judge Collier did not have the legal standard which we articulate today to guide him in his consideration of the case, and it is not reasonable to expect him to have applied it without the benefit of this opinion.

[5] When orders or rulings of the trial court are made under a misapprehension of existing law, this Court may either vacate and remand the case for further proceedings, modify or reverse, "as the rights of the parties and the applicable law may require." *State v. Cornell*, 281 N.C. 20, 30, 187 S.E. 2d 768, 774 (1972) (order

reversed). *Accord, Myers v. Myers*, 270 N.C. 263, 154 S.E. 2d 84 (1967) (order vacated; case remanded for *de novo* hearing); *Burns v. Riddle*, 265 N.C. 705, 144 S.E. 2d 847 (1965) (judgment vacated; remanded for "further hearing"). When findings of fact must be made in light of a prevailing legal standard, a new explication of the standard justifies our remanding the case for reconsideration *de novo* based upon the new explication. *See Morrison v. Burlington Industries*, 301 N.C. 226, 271 S.E. 2d 364 (1980).

We, therefore, vacate Judge Collier's order granting defendant a new trial and we remand the matter for a hearing *de novo* on defendant's motion for appropriate relief to be conducted and determined in a manner not inconsistent with this opinion.

Vacated and remanded.

Justice FRYE did not participate in the consideration or decision of this case.