INMAN, Judge.
 

 *727
 
 This case arises from a motion for appropriate relief alleging ineffective assistance of counsel in the second of two criminal trials, the first trial having resulted in a hung jury on all but one charge. We hold that because the motion raised disputed issues of fact, the trial court was required to conduct an evidentiary hearing before denying relief, and we therefore reverse the order below and remand the matter.
 

 *728
 
 Defendant Todd Joseph Martin ("Defendant") appeals the order which denied his motion for appropriate relief ("MAR"), without holding an evidentiary hearing, on the grounds that: (1) his trial counsel's performance fell within the range of reasonable professional assistance; (2) counsel's performance did not prejudice Defendant; and (3) any errors committed were harmless beyond a reasonable doubt and did not contribute to the guilty verdicts. On appeal, Defendant contends that the trial court erred by: (1) denying Defendant access to postconviction discovery statutorily authorized by N.C. Gen.Stat. § 15A-1415(f) ; (2) denying Defendant's motion for appropriate relief without holding an evidentiary hearing; and (3) concluding that Defendant's counsel was not constitutionally ineffective.
 

 After careful review, we reverse the trial court's order and remand for further proceedings.
 

 Factual and Procedural Background
 

 On 2 November 2009, Defendant was tried on charges of first degree kidnapping, attempted murder, first degree rape, two counts of first degree sexual offense, and assault by strangulation against his then-wife Mary
 
 [1]
 
 based on incidents that occurred on 19 August 2008. On 6 November 2009, the jury found Defendant guilty of assault by strangulation. It remained deadlocked on the remaining charges. The trial court declared a mistrial as to the remaining charges.
 

 The case came on for trial again on 3 January 2011, Judge Benjamin G. Alford presiding. Defendant was represented by a new attorney, Philip Clarke, III ("Mr. Clarke" or "defense counsel"), after his original attorney withdrew. The testimony at trial tended to establish the following: In 2008, Defendant and Mary separated but Defendant remained actively involved with the couple's two children who remained in the family home with Mary. According to Mary's testimony, during the evening of 18 August 2008, Defendant ate with her and the children and helped get them ready for bed. After that, Defendant left to go to work. Mary denied that Defendant was planning on returning to the home that night to sleep on the sofa. During the early morning hours, Mary awoke and noticed that her television, which she generally kept on, was off and saw her husband lying on the floor beside her bed, naked and sleeping. Mary began yelling at him that he had to leave. Defendant then climbed on top of her, removed her shorts, and starting penetrating her vaginally.
 

 *729
 
 Mary further testified that Defendant took her cell phone away and handcuffed her to the bed using a set of novelty handcuffs from his nightstand. Mary denied that she and Defendant had used the handcuffs before but acknowledged that they kept other novelty items in the top drawer of the nightstand. She was able to release the handcuffs, but once Defendant realized that she had done so, he stood on the bed, pulled her up by her hair, and forced his penis into her mouth. He flipped her onto her stomach after she tried to pull away and put her in a choke hold. He told her that he would kill her and "put [her] in a pond" near the house. Eventually, Mary lost consciousness. During cross-examination, Mary claimed that she was screaming and yelling during the entire incident prior to losing consciousness.
 

 *341
 
 When Mary woke up, Defendant was penetrating her anally, and she was lying in a pool of urine on the bed. Mary testified that when Defendant was "ready to finish," he pulled her up and ejaculated in her mouth. Defendant laid on the bed and eventually fell asleep. Before he fell asleep, Defendant told Mary that he had been at a bar that night using cocaine and had planned to kill himself with a gun he kept in his truck. After Defendant was asleep, Mary found her car keys, grabbed her two children, and ran out the front door.
 

 Mary drove to her friend Ashley Lawson's ("Ashley's") house. Mary told Ashley that Defendant had tried to kill her. Ashley called the police. Eventually, Ashley went with Mary to Carteret General Hospital where Mary worked part-time as a nurse. In the emergency room, Mary met with Sheila Martin ("Sheila"), a sexual assault nurse examiner ("SANE"), who examined Mary. Mary had been one of Sheila's students when Sheila was teaching part-time in a LPN program at the local community college. Sheila took several swabs from Mary's mouth, vagina, and anus.
 

 At trial, Sheila testified that after Mary told her the details of the assault, Sheila conducted a head-to-toe exam. She noted petechiae -red or purple marks on the skin caused by bleeding into the skin from broken capillaries-all over Mary's face. She also noticed a mark on Mary's neck, circumferential marks on her wrists, and a small tear in the top of her mouth. Sheila also conducted a pelvic exam and noticed no bruising or tears in Mary's vaginal or rectal area. She testified that this was not uncommon and that, in many cases of rape, there is no tearing or bruising. In other words, according to Sheila, the absence of tearing
 
 *730
 
 or bruising does not necessarily mean that sex was consensual. Sheila noticed some blood in Mary's cervical os, an opening between the cervix and the uterus.
 
 [2]
 

 Mary also testified at trial about a prior incident in March 2008 when Defendant attempted to rape her but she was able to talk him out of it on that occasion, and about two other incidents, in the spring or fall of 2006 and in January or February in 2007, when Defendant had had sex with her against her will. After the incident in March 2008, Mary called the police, and Officer Horst with the Newport Police Department responded. After that incident, Mary claimed that she and Defendant began attending counseling.
 

 Jessica Posto, a forensic biologist with the State Bureau of Investigation, ("Ms. Posto") testified at trial regarding the testing of evidence obtained from the sexual assault evidence collection kit used at the hospital and from clothing Mary was wearing the night of 18 August 2008. Ms. Posto found sperm on Mary's tank top, but vaginal, rectal, and oral swabs came back negative for semen. The vaginal swab tested positive for blood.
 

 The only testimony defense counsel offered to rebut the State's medical evidence was that of Brent Turvey ("Mr. Turvey"). Mr. Turvey was a forensic scientist hired by the defense to explain "why evidence is, what it means, what it does not mean, very often what can be done with the evidence, [and] what hasn't been doing with the evidence." In his affidavit attached in support of Defendant's MAR, Mr. Clarke refers to Mr. Turvey as an expert in "rape investigations." However, Mr. Turvey does not have a medical background. During
 
 voir dire,
 
 outside the presence of the jury, Mr. Turvey claimed to have performed forensic examinations of sexual assaults for court purposes, including crime reconstruction and examinations of the physical evidence. Mr. Turvey stated that he had been asked to look at the physical evidence in this case to determine whether it supported Mary's version of the events. During his lengthy
 
 voir dire,
 
 Mr. Turvey testified that the physical evidence was inconsistent with the alleged version of events leading up to the sexual assault, the physical evidence was inconsistent with Mary's version of the sexual assault, and there was evidence that Mary was making false sexual assault allegations that the police failed to further investigate. Mr. Turvey attempted
 
 *342
 
 to testify several times about the SANE's findings, but
 
 *731
 
 Judge Alford stopped his testimony, noting that Mr. Turvey did not have a medical degree.
 

 After
 
 voir dire,
 
 Judge Alford excluded Mr. Turvey's testimony, noting that:
 

 the Court has heard the testimony of Mr. Turvey, has reviewed his curriculum vitae. He has, the Court has reviewed his forensic examination, and from all of that this Court can only conclude that the defendant seeks through Mr. Turvey to offer certain opinions about the investigation that was done in this case about which expert testimony is not needed. He also seeks in his opinions to invade the province of the jury. He also seeks to offer opinions on the evidence involving the credibility of certain witnesses and other evidence, which is totally, totally within the province of the jury; and we don't need expert testimony to show inconsistencies in the evidence, and as such and for other reasons, this Court will not permit the admission of that testimony or his admission as an expert witness.
 

 Judge Alford acknowledged that "inconsistencies" existed in this case but that "nobody needs an expert to show[ ] those inconsistencies."
 

 Defendant, who testified on his own behalf at trial, admitted engaging in sex with Mary, but claimed that it was consensual and that nothing the couple did that night was "new." According to Defendant, after engaging in consensual sex, Mary began asking him about other women. Defendant admitted to her that he had been talking to another woman and that he was planning to see her. Defendant refused to identify the woman because it would "confirm [Mary's] suspicions." Mary became very upset and started threatening Defendant about his job and the children. Mary tried to kick him out of the house, and Defendant admitted that he placed her in a chokehold. After he released her, Defendant told her that "if [she] keep[s] fucking around [he'll] put [her] ass in that pond." Mary went to the bathroom and noticed how red her eyes were from being placed in the chokehold. Eventually, Defendant fell asleep. When he woke around 5:15 a.m., he noticed that Mary and the children were gone. Defendant called Mary's phone and knew, based on the background noises, that she was at the hospital. He drove to the hospital to try and see her, but he was refused access. Defendant was arrested later that same day.
 

 On 7 January 2011, the jury returned not guilty verdicts for the charges of attempted murder and first degree rape. The jury found
 
 *732
 
 Defendant guilty of first degree kidnapping, first degree sexual offense (fellatio), and second degree sexual offense (anal intercourse). On 7 August 2012, this Court vacated Defendant's conviction for first degree kidnapping because it violated double jeopardy.
 
 See
 

 State v. Martin,
 

 222 N.C.App. 213
 
 , 221,
 
 729 S.E.2d 717
 
 , 723 (2012). Judge Alford sentenced defendant to a minimum term of 100 months to a maximum term of 129 months imprisonment for second degree sexual offense and 288 to 355 months imprisonment for first degree sexual offense, sentences to run consecutively.
 
 [3]
 

 On 10 March 2014, Defendant filed a MAR, arguing that his constitutional right to effective counsel was violated because of his counsel's several failings during the second trial. Defendant claimed that his counsel's failure to procure an evaluation by a medical expert to rebut the testimony of Sheila fell short of professional standards. Specifically, Defendant alleged that his counsel should have known that Mr. Turvey's testimony would be inadmissible and that another expert could have been properly admitted as an expert to discount Sheila's claims that the evidence supported rape. Defendant also claimed that his counsel was ineffective for failing to impeach Mary with her reports to Sheila and the lead detective. Specifically, Defendant contended that his trial counsel should have impeached her with her inconsistent statements about how she was handcuffed in her report to the police; her report to police that she was penetrated digitally, which she denied
 
 *343
 
 at trial; and a prior false allegation of rape Mary had made as a teenager.
 
 [4]
 

 Defendant also alleged that his trial counsel was ineffective for failing to cross-examine Mary about her previous trial testimony denying that Defendant kept toiletries in the bathroom and about her conversation with Defendant at the time she was being examined in the emergency room. Defendant also alleged that his trial counsel was ineffective for failing to object to the admission of hearsay evidence contained in a written statement by Ashley, the friend who took Mary to the hospital. Ashley wrote in the statement that Mary's daughter told her that "she [had] heard mommy screaming help in her pillow."
 

 Finally, Defendant alleged that his counsel was ineffective for failing to cross-examine the State's witnesses regarding the following
 
 *733
 
 information: (1) the bed sheets were never tested by police to see if there was any urine on them, even though police took the sheets into evidence; this is even more important, according to Defendant, because Mary testified at the first trial that the urine on her was from her daughter; (2) a police officer who responded to the neighboring duplex that night testified in Defendant's first trial that he did not hear any screaming even though Mary testified that she screamed throughout the incident; (3) defense counsel failed to establish that the police officer who sat with Defendant while he was being tested did not observe any signs that Defendant had been engaged in any type of assault or struggle; (4) even though Mary testified that she had not had sex with Defendant since late July or early August, photographs show an open condom wrapper and a used condom in her bedroom; (5) police failed to test the condom wrapper or used condom for evidence; and (6) police failed to take any photographs of the headboard where Mary claimed she was handcuffed during the attack.
 

 Defendant submitted, along with his MAR, an affidavit by Mr. Clarke admitting all of the errors alleged in Defendant's MAR. Mr. Clarke stated under oath that none of his failures had been strategic decisions. Defendant also submitted an affidavit by Bonnie Price, another SANE, who has been admitted as an expert in North Carolina courts, and Sarah Olson, who is employed as Forensic Resource Counsel with IDS, showing that each was available to consult with Mr. Clarke before trial.
 

 At the time he filed the MAR, Defendant also filed a motion for discovery, pursuant to N.C. Gen.Stat. § 15A-1415(f), contending that he was entitled to all documents generated by the law enforcement and prosecuting agencies involved in Defendant's case. On 9 December 2014, Judge Alford denied the MAR without holding a hearing. In his order denying the motions, Judge Alford made the following pertinent findings:
 

 10. All questions of fact are resolved by the motion, the state's response, exhibits, affidavits, the court file, the Appellate Court decision and the trial transcripts.
 

 11. Counsel's performance was not so deficient to have the defendant found not guilty of Attempted First Degree Murder and First Degree Rape.
 

 12. On appeal the defendant failed to raise ineffective assistance of counsel.
 

 13. Counsel's performance was reasonable under prevailing professional norms.
 

 *734
 
 14. The jury was in a position to hear all the evidence and judge the credibility of all the witnesses including the testimony of the defendant.
 

 15. Any error that may have been committed by counsel was harmless beyond a reasonable doubt and did not contribute to the verdict obtained.
 

 Defendant timely appeals.
 

 Analysis
 

 Defendant argues that the trial court erred by denying him an evidentiary hearing on his MAR claiming ineffective assistance of counsel. We agree, because the trial court resolved the motion by deciding issues of fact contrary to Defendant's allegations.
 

 *344
 
 The procedure governing MARs is set out in N.C. Gen.Stat. § 15A-1420 (2013), and subsection (c) discusses the trial court's duty to hold an evidentiary hearing on such motions:
 

 (c) Hearings, Showing of Prejudice; Findings.-
 

 (1) Any party is entitled to a hearing on questions of law or fact arising from the motion and any supporting or opposing information presented unless the court determines that the motion is without merit. The court must determine, on the basis of these materials and the requirements of this subsection, whether an evidentiary hearing is required to resolve questions of fact. Upon the motion of either party, the judge may direct the attorneys for the parties to appear before him for a conference on any prehearing matter in the case.
 

 ...
 

 (3) The court must determine the motion without an evidentiary hearing when the motion and supporting and opposing information present only questions of law. The defendant has no right to be present at such a hearing where only questions of law are to be argued.
 

 This Court reviews the trial court's conclusions of law in an order denying an MAR
 
 de novo.
 

 [5]
 

 *735
 

 State v. Jackson,
 

 220 N.C.App. 1
 
 , 8,
 
 727 S.E.2d 322
 
 , 329 (2012). "Whether the trial court was required to afford defendant an evidentiary hearing is primarily a question of law subject to
 
 de novo
 
 review."
 
 State v. Marino,
 

 229 N.C.App. 130
 
 , 140,
 
 747 S.E.2d 633
 
 , 640 (2013),
 
 disc. review denied,
 

 367 N.C. 263
 
 ,
 
 749 S.E.2d 889
 
 (2013).
 

 In interpreting the statutes regarding an evidentiary hearing, this Court has noted:
 

 Under subsection (c)(4) [of N.C. Gen.Stat. § 15A-1420 ], read in
 
 pari materia
 
 with subsections (c)(1), (c)(2), and (c)(3), an evidentiary hearing is required unless the motion presents assertions of fact which will entitle the defendant to no relief even if resolved in his favor, or the motion presents only questions of law. Thus, the ultimate question that must be addressed in determining whether a motion for appropriate relief should be summarily denied is whether the information contained in the record and presented in the defendant's motion for appropriate relief would suffice, if believed, to support an award of relief.
 

 Jackson,
 

 220 N.C.App. at 6
 
 ,
 
 727 S.E.2d at 328
 
 (internal quotation marks and citations omitted).
 

 Here, Judge Alford disposed of Defendant's MAR without holding a hearing because all questions of fact were "resolved" by the pleadings and because Defendant failed to show that his counsel's performance was constitutionally ineffective or that Defendant suffered any prejudice as a result of his counsel's performance. Defendant's MAR was based, generally, on his claims that his trial counsel was ineffective for: (1) failing to use testimony from Defendant's first 2009 trial to impeach the witnesses during the second trial; (2) failing to obtain a qualified medical expert to rebut the testimony of Sheila; (3) failing to properly cross-examine the State's witnesses, primarily the police officers, about their failure to properly collect and test all of the evidence in the case; and (4) failing to object to the admission of Ashley's written statement regarding Mary's daughter's statement.
 

 *736
 
 While we do not think that all the evidence Defendant listed in his brief related to impeachment was especially compelling,
 
 [6]
 
 we are
 
 *345
 
 persuaded that defense counsel's failure to obtain a medical expert to rebut the testimony of Sheila, the sexual abuse nurse examiner, and his failure to properly cross-examine the State's witnesses with regard to material evidence that could have had a substantial impact on the jury's verdict, entitles Defendant to an evidentiary hearing. This was a case of "he said, she said" with no physical evidence of rape. There was no evidence of semen in Mary's vagina, anus, or mouth. While Sheila testified that the evidence she obtained during her examination of Mary did not necessarily show consensual sex, the absence of any signs of violence provided defense counsel an opportunity to contradict Mary's allegations with another medical expert, an opportunity which defense counsel inexplicably failed to take. Bonnie Price, who has been a SANE since 2002, stated in her affidavit in support of the MAR that, in her experience, about half of the examinations of patients reporting rape involve anogenital findings and half do not. This affidavit, standing on its own, was not sufficient to compel the trial court to allow the MAR, but it demonstrates the factual nature of the dispute and the significance of expert medical testimony. Because the trial court did not conduct an evidentiary hearing, we do not know what Ms. Price's further testimony would have been. The analysis of this evidence is especially material because Sheila and Mary had a prior relationship which could have undermined the credibility of Sheila's testimony.
 

 Moreover, while Mr. Clarke attempted to introduce the expert testimony of Mr. Turvey to rebut Sheila's testimony, it was reasonably foreseeable that the trial court would exclude it because Mr. Turvey, the proposed expert, had no medical training and because the testimony was clearly outside the scope of his competency.
 

 Finally, impeachment evidence that may undermine the State's case could be further strengthened by the fact that the police failed to collect key evidence that could have substantiated or contradicted Mary's allegations. The police did not photograph the bed's headboard where Mary claimed she was handcuffed during the rape. The bedsheets were not photographed or tested for evidence of urine. It is undisputed that the police did not test, collect, or even ask Mary about a used condom and condom wrapper found in the bedroom immediately after she reported
 
 *737
 
 being raped. These obvious gaps in the police investigation as to crucial evidence should have been exposed by Mr. Clarke during trial.
 

 In totality, our review, in conjunction with Mr. Clarke's own admissions that he made nonstrategic decisions that probably had an impact on the jury's finding of guilt, the factual circumstances of this case were such that an evidentiary hearing should have been held to fully develop the validity of Defendant's ineffective assistance of counsel claim. We do not decide whether the evidence put forth in Defendant's MAR was sufficient to entitle him to relief, but it was enough to raise a factual dispute and, therefore, entitled Defendant to an evidentiary hearing.
 

 Defendant also argues that the trial court erred by denying his MAR before Defendant had received the postconviction discovery he was entitled to under section 15A-1415 (f), (g) and requested in his motion for postconviction discovery. While it is undisputed that Defendant obtained some discovery from the original prosecuting agency's file, Defendant's appellate counsel in oral argument claimed that a "critical piece of discovery," an August 2008 videotaped interview between Mary, Detective Fuller, and someone from the rape crisis center "that was referenced by other discovery materials and by the lead detective[,]" was not provided. We remand this issue for consideration by the trial court.
 

 N.C. Gen.Stat. § 15A-1415(f)
 
 [7]
 
 states that
 

 In the case of a defendant who is represented by counsel in postconviction proceedings in superior court, the defendant's prior trial or appellate counsel shall make available to the defendant's counsel their complete files relating to the case of the defendant. The State, to the extent allowed by law, shall make available to the
 
 *346
 
 defendant's counsel the complete files of all law enforcement and prosecutorial agencies involved in the investigation of the crimes committed or the prosecution of the defendant.
 

 Even though Defendant filed a motion for discovery contemporaneously with his MAR and a motion to stay a decision on the MAR until his counsel had received all postconviction discovery, the trial court made no findings or conclusions regarding Defendant's access, or lack thereof, to all the postconviction discovery he was entitled to receive. The State
 
 *738
 
 conceded at oral argument that Defendant's attorney in his original 2009 trial referenced this videotape but represented that this evidence is simply "unavailable." The State argues that because there is no evidence that this tape would have made any difference at trial, Defendant is not entitled to any relief on this ground.
 

 Because the videotape is missing, we are unable to ascertain the exact nature of the evidence on the tape, decide whether it was a material piece of evidence, or determine the status of this evidence given its undisputed existence but unclear location. The record sheds no light on why the videotape is missing. Therefore, on remand, Judge Alford should also address whether the State failed to fully comply with N.C. Gen.Stat. § 15A-1415(f) and whether Defendant is entitled to any relief due to the State's failure to provide it.
 
 See generally
 

 State v. McDowell,
 

 310 N.C. 61
 
 , 73,
 
 310 S.E.2d 301
 
 , 309 (1984) (explaining the standard of review a trial judge undertakes when reviewing a defendant's MAR and determining whether he is entitled to a new trial based on undisclosed evidence: "Would the evidence, had it been disclosed to the jury which convicted defendant, and in light of all other evidence which that jury heard, likely have created in the jury's mind a reasonable doubt which did not otherwise exist as to defendant's guilt?").
 

 Conclusion
 

 For the reasons set out above, because "the facts disclosed in defendant's motion for appropriate relief reveal issues of fact which could not be resolved solely on the basis of [the record]," the trial court erred in failing to conduct an evidentiary hearing that would have allowed Defendant "to produce evidence to substantiate his allegations" in the MAR.
 
 State v. Hardison,
 

 126 N.C.App. 52
 
 , 57,
 
 483 S.E.2d 459
 
 , 462 (1997). Therefore, we reverse the trial court's order and remand for hearings consistent with this opinion.
 

 REVERSED AND REMANDED.
 

 Chief Judge McGEE and Judge ELMORE concur.
 

 [1]
 

 We have used a pseudonym in an effort to protect the victim's identity.
 

 [2]
 

 At Defendant's first trial, Sheila testified that the blood "could have been normal" and related to Mary's menstrual cycle; however, at the second trial, she was not asked about this earlier testimony or whether the blood could be related to her menstrual cycle.
 

 [3]
 

 Although Defendant had also been sentenced for first degree kidnapping, this Court's opinion vacating this conviction did not affect Defendant's sentences for the sexual offenses.
 

 [4]
 

 The prior false allegation was introduced by defense counsel to impeach Mary's credibility in the first trial.
 

 [5]
 

 We note that the standard of review employed by this Court in reviewing a defendant's MAR is a matter in dispute by the parties. The State is correct that a trial court's decision to deny a defendant's MAR brought under N.C. Gen.Stat. § 15A-1414 is reviewed for an abuse of discretion.
 
 See
 

 State v. Elliott,
 

 360 N.C. 400
 
 , 419,
 
 628 S.E.2d 735
 
 , 748 (2006). However, here, Defendant's MAR was brought under a different statute, N.C. Gen.Stat. § 15A-1415. Moreover, the issue we decide is not whether the trial court erred in denying the MAR but, rather, whether the trial court erred in denying it without holding a hearing, which requires a separate and distinct analysis.
 

 [6]
 

 We note that Mr. Clarke actually did impeach the witnesses on some of the evidence listed in Defendant's brief. Specifically, defense counsel impeached Mary regarding the knives in the bedroom and her claim that Defendant made her bite his neck.
 

 [7]
 

 Although the statute previously applied only to capital defendants, it was amended effective 1 December 2009 and now applies to all postconviction proceedings in superior court.