STATE OF NORTH CAROLINA v. BOBBY RAY BROWN

No. 661A85

(Filed 26 July 1990)

1. **Jury § 6.2 (NCI3d) — murder — jury selection — objection to form of question**

    There was no prejudice or abuse of discretion during jury selection in a murder prosecution where the trial court sustained an objection to defendant's question to venirepersons as to whether they were comfortable with the fact that it might be necessary for him to question police procedure, but the objection was sustained to the form of the question and defendant soon asked the same question in slightly different form.

    **Am Jur 2d, Jury §§ 136 et seq.**

2. **Jury § 7.11 (NCI3d) — murder — jury selection — feelings about death penalty — excusal for cause**

    There was no error during jury selection for a murder prosecution in the excusal of six prospective jurors for cause due to their feelings about the death penalty where the prospective jurors all agreed that they would automatically vote

1

**STATE v. BROWN**

[327 N.C. 1 (1990)]

against the imposition of the death penalty regardless of the circumstances, all of the prospective jurors declared their position unequivocally and defendant made no showing that rehabilitative questioning would have elicited different answers.

**Am Jur 2d, Jury §§ 165, 202, 289.**

3. **Criminal Law § 1318 (NCI4th)— murder—jury selection— requested instruction on bifurcated procedure—denied**

There was no abuse of discretion during jury selection in a murder prosecution from the trial court's refusal to give a requested preliminary instruction regarding the bifurcated procedures in capital trials where the court chose instead to give the pattern jury instruction for that situation.

**Am Jur 2d, Trial § 601.**

4. **Jury § 6 (NCI3d)— murder—jury selection—individual voir dire and sequestration denied—no error**

There was no error in a murder prosection in denying defendant's motion for individual voir dire and sequestration of jurors.

**Am Jur 2d, Jury §§ 196, 197.**

5. **Criminal Law § 162 (NCI3d)— murder—cross-examination about rumors—objection to relevancy properly denied—no further objection**

There was no error in a murder prosecution in allowing the prosecutor to cross-examine a defense witness with regard to rumors concerning defendant's guilt where defendant objected only once, that objection was based on relevancy, the evidence was clearly relevant because it related to a matter elicited on direct examination, no objection was made on hearsay grounds, and similar evidence was later admitted without objection.

**Am Jur 2d, Witnesses § 492.**

6. **Criminal Law § 460 (NCI4th)— murder—prosecutor's argument—inferences arising from rumor**

The trial court did not err in a murder prosecution by allowing the prosecutor to argue inferences arising from testimony about rumors in the community where the testimony was elicited by defendant on direct examination and defendant

STATE v. BROWN

[327 N.C. 1 (1990)]

neither raised an objection on hearsay grounds at trial nor asked for an instruction limiting the jury's consideration of the evidence to impeachment purposes. The prosecutor's remarks were based upon facts in evidence and the reasonable inferences to be drawn therefrom.

**Am Jur 2d, Trial §§ 218 et seq.**

7. **Criminal Law § 468 (NCI4th) — murder — prosecutor's arguments**
There was no gross error requiring that a guilty verdict be set aside in a murder prosecution where the prosecutor implied during his closing argument that defense counsel was attempting to obscure the truth from the jury, that an accomplice who had testified for the State had not gained an untoward advantage by virtue of his plea arrangement, that the accomplice had been terrorized prior to trial even though there was no evidence in the record to that effect, and that defendant's alibi witnesses had motives to lie to protect him.

**Am Jur 2d, Trial §§ 218 et seq.**

8. **Criminal Law § 82.1 (NCI3d); Constitutional Law § 40 (NCI3d) — statements overheard at jailhouse telephone — admissible**
There was no error in a murder prosecution from admitting an SBI agent's statement concerning defendant's telephone call from jail because defendant's statement was not made to his attorney, the statement was not made in confidence in that defendant spoke in the presence of the agent from a telephone located by the elevator inside the county jail, and defendant's constitutional right to counsel was not implicated.

**Am Jur 2d, Homicide §§ 337 et seq.**

9. **Homicide § 25 (NCI3d) — murder — instruction on intent to kill omitted — no error**
There was no plain error in a first degree murder prosecution from the omission of the portion of the pattern jury instruction which states that defendant formed the intent to kill over some period of time, however short, before he acted where the defense was total innocence, as presented by several alibi witnesses, and not that defendant shot the victim in an unpremeditated manner. The evidence presented no issue as to defendant's state of mind or the existence of a calculated

plan to kill the victim, but called for a determination of the credibility of the witnesses. The jury's verdict of guilty of first degree murder and conspiracy to murder demonstrates its belief that the State's witness testified truthfully regarding the existence of a premeditated plan to kill the victim; additional instructions on the element of premeditation would have had no effect on the verdict.

**Am Jur 2d, Homicide § 501.**

10. **Homicide §§ 23.1, 25.2 (NCI3d) — murder — instructions — proximate cause and premeditation and deliberation — no error**

There was no plain error in a murder prosecution in the court's instruction on proximate cause and premeditation and deliberation as distinguished between the acts of defendant and those of an accomplice where the jury charge, when viewed as a whole, was replete with instructions directing the jury's consideration to defendant's acts alone.

**Am Jur 2d, Homicide § 501.**

11. **Criminal Law § 793 (NCI4th) — murder — failure to give acting in concert instruction — no error**

There was no error in a murder prosecution from the trial court's failure to instruct on acting in concert even though the prosecutor argued acting in concert to the jury because the absence of an acting in concert instruction could only have benefitted defendant.

**Am Jur 2d, Homicide §§ 482, 496.**

12. **Criminal Law § 959 (NCI4th) — murder — recanted testimony — motion for appropriate relief denied**

The trial court did not err in a murder prosecution by denying defendant's motion for appropriate relief on the basis of recanted testimony where the trial court concluded that it was not reasonably well satisfied that the trial testimony was false; the evidence did not compel a ruling in defendant's favor; the evidence supported the trial court's finding that the events which led to the State's witness's inconsistent statements and trial testimony were in substance before the jury which returned the guilty verdict; defendant's argument that the jury's belief of the trial testimony was irrelevant was rejected in the context of this case; and the findings of

fact upon which the denial of the motion for appropriate relief was based were supported by the evidence.

**Am Jur 2d, Homicide § 558.**

13. **Criminal Law § 959 (NCI4th) — murder — motion for appropriate relief — withheld statements — denied**

The trial court did not err in a murder prosecution by denying defendant's motion to amend his motion for appropriate relief to assert as an additional ground the State's alleged withholding from defense counsel of statements by a witness where the proffered evidence bore remotely, if at all, on defendant's guilt. Moreover, the statements were admitted at the post-conviction hearing so that the judge could consider how the statements reflected on the recanted testimony issue, precisely the relief sought by defendant.

**Am Jur 2d, Homicide § 558.**

14. **Criminal Law § 951 (NCI4th) — murder — motion for appropriate relief — introduction of letter by witness — no error**

There was no prejudice in a motion for appropriate relief following a murder conviction in allowing cross-examination of a State's witness regarding a letter allegedly written by the witness admitting guilt where the court stated in its order denying the motion that it had not considered any evidence elicited by the State about the letter.

**Am Jur 2d, Homicide § 558.**

15. **Criminal Law § 1352 (NCI4th) — murder — sentencing — mitigating circumstance — unanimity requirement**

A death sentence was set aside and remanded for a new hearing under the *McKoy* harmless error analysis where there was evidence to support at least some of the mitigating circumstances submitted, yet the jury found none of the circumstances.

**Am Jur 2d, Criminal Law § 628.**

APPEAL of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing the sentence of death entered by *Wood, J.,* at the 23 September 1985 Criminal Session of Superior Court, ROCKINGHAM County. Heard in the Supreme Court 13 February 1990.

**STATE v. BROWN**

[327 N.C. 1 (1990)]

*Lacy H. Thornburg, Attorney General, by William N. Farrell, Jr., Special Deputy Attorney General, for the State.*

*Kenneth S. Broun and J. Anthony Penry for defendant-appellant.*

WHICHARD, Justice.

Defendant was convicted of murder in the first degree and conspiracy to commit murder. The jury recommended the death sentence for the murder. The trial court sentenced accordingly, and imposed a sentence of ten years imprisonment for the conspiracy conviction. We find no error in the guilt-innocence phase of the trial on either charge. Because we find prejudicial error in the sentencing phase on the murder charge, we remand for a new capital sentencing hearing.

Richard Lee Hopper, known as Ricky, was the State's principal witness at trial. He was twenty-one years old at the time of trial and had known defendant for approximately eight years. Defendant had worked for Hopper's father. After Hopper's father died when Hopper was thirteen, Hopper began spending most of his free time at the farm where defendant lived, and Hopper looked up to defendant almost as a father. Hopper quit school during the tenth grade.

Hopper testified that on 1 August 1981 he was at the farm with defendant. Defendant asked Hopper if he wanted to make some money and Hopper responded that he did. Defendant then said a man "had to be done away with" and Hopper could make $1,500. Hopper was scared, but the money "sounded tremendously good." He saw defendant next on 3 August at the farm. Defendant asked if Hopper thought he could go through with it, and he said he could. Hopper testified: "I asked why he had to be killed and he said that he was going to testify in a federal grand jury in Roanoke, Virginia, against some powerful people." Defendant assured Hopper he would get $1,500 and told him that Wayne Tilley was the person they were supposed to kill. Defendant said Lindley Tate would pay them for killing Tilley.

On 4 August 1981 Hopper borrowed his mother's car because his own car and defendant's car had loud engines and would be easy to identify. He met defendant at the farm. Defendant told Hopper they would leave a few minutes after 9:00 p.m. Defendant loaded a double-barreled sawed-off shotgun. Hopper drove his

mother's car to Tilley's home with defendant sitting in the passenger seat. As they approached Tilley's home, Tilley was standing by his mailbox. When they were about six to eight feet from Tilley, defendant fired the first shot from the window of the passenger side of the car. Tilley fell to his knees. Hopper had stopped the car when defendant fired the first shot. When he saw that Tilley did not fall, Hopper was scared Tilley was still alive, so he jumped out of the car with the shotgun, leaned across the trunk of the car, and shot him. Hopper testified he did not see anyone else around, but did see a bright-colored compact car sitting across the street from Tilley's house. Hopper drove away and rode around for approximately twenty minutes, then dropped defendant off at the farm. Hopper asked defendant about an alibi, and defendant said that his was taken care of. Hopper went to his mother's house at around 9:30 p.m. He then went to the Cook Block, a section of town where the young people hang out, and stayed there until about 2:00 a.m. Defendant paid Hopper $1,500 on 5 August 1981 in the living room of defendant's home. Hopper testified that he was supposed to drive only and had not planned to shoot Tilley.

In 1984 Hopper began living with Michelle Tuttle, her sister Bamby, and defendant. Michelle was sentenced to jail for shoplifting in March 1985. She gave Hopper a message from a detective who wanted to talk to Hopper about the Tilley case. He spoke to the district attorney, who told him that if he was not the "trigger man," and if he would testify truthfully, he would be granted immunity for his actions in connection with the Tilley murder and could go into the federal witness protection program. Hopper said he needed more time to think. At the time he had no charges pending against him. In May 1985, while in custody on charges relating to a stolen truck, he gave a statement to Detective Page implicating defendant and himself in the Tilley murder. In this statement Hopper stated that he was driving defendant's van rather than his mother's car at the time of the murder, and that defendant fired both shots.

Hopper testified that on the Friday before trial the district attorney told him the details were not working out and he thought Hopper was holding back on him. Hopper then admitted to firing the second shot. Hopper testified that it was his understanding that in exchange for testifying truthfully in defendant's murder trial, he would be prosecuted for murder and conspiracy to commit murder but the district attorney would recommend a suspended

sentence and probation. Hopper was not going into the federal witness relocation program, but would receive money to help him relocate. The money he received would help defray his expenses, but he was not "mak[ing] a profit out of this." While waiting for defendant's trial, the FBI and SBI had assisted Hopper and his family by providing a place for them to stay and buying food for them. Hopper estimated that the agencies spent $75-$125 per week for these expenses.

On cross-examination, Hopper testified that he was charged with uttering a forged instrument in 1985. That charge was still pending at the time of trial. In May 1985 Hopper was also charged with unauthorized use of a motor vehicle, larceny, and breaking and entering; all these charges were also still pending at the time of trial. Hopper gave his first statement to Detective Page after these charges had been filed against him. In that statement, Hopper stated that he and defendant drove around in Virginia for over an hour after shooting Tilley before returning to the farm, and that he spent the night at the farm after the murder rather than going back to his mother's house. Hopper stated that his direction of travel was north toward Virginia on Friendly Road. Detective Page then read into the record Hopper's statement made 16 May 1985, when he was arrested on charges relating to a stolen truck.

Thomas J. Barrington, Special Agent with the FBI, testified that the murder victim, Clarence Wayne Tilley, came to the SBI in 1979 to offer information about drug trafficking in Rockingham County, North Carolina and Wise County, Virginia. Tilley provided information to agents in both the SBI and FBI until his death in 1981, when he was preparing to testify before a federal grand jury.

Robert Craig, an FBI agent, testified that in June 1981 a reporter obtained a copy of a search warrant affidavit written by Agent Craig and based upon information given by Tilley. The court had ordered the affidavit sealed to protect the confidentiality of Tilley and other informers, but the affidavit was left in a file drawer and discovered by the newspaper reporter. The reporter then wrote a story based on the information in the affidavit, so that if one knew the background of the information, it was possible to guess the source. The newspaper story was published approximately six weeks before Tilley's death. Tilley received threatening telephone calls prior to his death. Tilley had been offered protection under the federal witness protection program but did not want to relocate.

Agent Craig testified further that Ricky Hopper had been offered protection under the federal witness protection program in connection with his testimony at trial. It was Craig's understanding that Hopper would not go to jail and would receive an allowance until he got established in a new area. Hopper had not entered the witness protection program officially, but had received assistance from the FBI, including money for living expenses, to relocate on his own.

Samuel S. Page, a detective with the Rockingham County Sheriff's Department, testified that in the spring of 1985 he had a conversation with Michelle Tuttle, who later married Ricky Hopper. Detective Page told Ms. Tuttle that if Ricky had information about the Tilley murder, he might be able to get into the witness protection program. Detective Page met with Ricky Hopper several times and encouraged him to make a statement. Hopper did make a statement in May 1985. On cross-examination, Detective Page agreed that Ms. Tuttle had been in jail during the spring of 1985, and during the time that she was giving Hopper messages her sentence was modified to weekend incarceration so that she could take care of her young child.

Terry Johnson, an SBI agent, served defendant with a warrant on 29 August 1981 in connection with the Tilley murder. Agent Johnson took defendant to the county jail for questioning. From there, defendant used a telephone located near the elevator to make a telephone call. Johnson observed defendant dial a number and say, "Listen, get in touch with Benny, that goddamn Ricky Hopper has done run his mouth."

Agent Johnson also read into the record a statement made by Ricky Hopper on 23 May 1985. In this statement, Hopper maintained that defendant fired both shots. As Hopper and defendant drove from the murder scene, they headed toward Virginia but went straight to the farm, where they both went to bed. Hopper stated he never saw the sawed-off shotgun again after the murder. In his previous statement, he said he saw it for the last time the next morning when he got up to cook breakfast.

Agent Johnson then testified that he and other investigators got together with the district attorney before the trial and decided Hopper was not being truthful. They confronted Hopper and told him "he better get his heart right, that I did not believe completely his original statement and now was the time." Johnson did not

tell him what discrepancies existed between other witnesses' stories and his own. Hopper wept and admitted he used his mother's car in the killing. Johnson stated that was not the only problem, then asked him if he had killed Tilley. Hopper admitted that he had fired one of the shots, then gave a statement which comported with his testimony at trial. At the time Hopper admitted killing Tilley, he had no assurance that a suspended sentence would be recommended, as he knew the offer of immunity depended on his not being the "triggerman." Johnson then read into the record Hopper's statement taken 20 September 1985.

Patricia Carter lived across the street from Tilley prior to his death. She testified that on 4 August 1981 at 9:00 p.m. she left her home to go to her grandmother's house down the street. As she left, she saw a small blue car parked on the side of the road across the street from the Tilley residence. When she returned home around 9:30 p.m., Tilley had been shot and an ambulance was at the scene. She did not notice whether the small blue car was still parked across the street.

Debra Craig testified that on 4 August 1981 she was visiting her in-laws' home half a block from the Tilley residence on the opposite side of the street. As she arrived, she saw a car parked across the street from the Tilley home. Its headlights were on, and it was sitting still. As she pulled into the driveway she heard a loud noise, then another. Recognizing the second noise to be a gunshot, she ran into the carport and waited until the car drove away. As it went under the street light she saw that it was of medium size and a light color. Ms. Craig also saw a car parked on the same side of the street as the Tilley house.

Nancy Sasserman lived in the house next to the Tilley home. On 4 August 1981 she was looking out a window when she saw a car pull up across the street, cut off its headlights, and put on its parking lights. It was turning dark outside but was not yet totally dark. The car sat for a minute or two, then Ms. Sasserman heard a man's voice and saw a gun blast come from the front of the car, almost over the wheel. Seconds later another gun blast came from the back of the car. She heard a single car door shut. The car drove off "like nothing had happened." Ms. Sasserman ran outside and found Wayne Tilley lying in the road, shot. Ms. Sasserman was later recalled as a witness by defendant to establish

that the car from which the shots were fired was travelling south toward Aiken Road.

Dr. Anthony Macri, an expert in pathology, performed an autopsy on the victim's body. He found two sets of wounds, one on the left side of the abdomen and the other on the right side of the chest. Each set of wounds consisted of multiple entry wounds or holes. Inside the body Dr. Macri found extensive organ injury and shotgun pellets. A bruised area was present on the left forearm, bearing the imprint of shotgun wadding. Dr. Marci testified that either of the gunshot wounds would have been fatal. He estimated that the victim lived less than a minute after being shot.

Reid Boyd testified for the defense. He stated he had been charged with the murder of Wayne Tilley, but all charges were dropped by the State. At one time Boyd had confessed to participation in the murder, but this was a false confession given under intense pressure by state and federal agents. One agent had "roughed him up" in a motel room, pushing him against a wall and striking him twice. He stated that Agent Johnson informed him of the pertinent details of the case in an effort to persuade him to implicate defendant and Ricky Hopper. On cross-examination, Boyd acknowledged that he had initially lied about his participation in the murder. He agreed that everything he knew about the murder came through rumors and hearsay and was not necessarily true. Boyd had given a statement at one time implicating two males named Gary and Steve. Boyd stated they were driving a yellow Dodge van and invited Boyd to go riding around with them. The ride culminated in driving by Tilley's house and shooting him. Boyd repeatedly denied remembering the content of other statements given to the authorities, insisting they were all composed of lies and were based on the rumors heard around Eden concerning the Tilley murder. Boyd acknowledged that he eventually told police Gary and Steve were pseudonyms for Ricky Hopper and defendant, but stated that this was again based on rumor and not his personal knowledge. Boyd agreed that the original rumors were that defendant and Hopper had committed the murder.

Defendant presented alibi evidence. Mike Vaughn testified that he saw defendant on 4 August 1981 in Vaughn's home in Danville from 4:00 to 6:00 p.m. Vaughn and defendant then went together to Curtis Adkins' home in Callans, Virginia. At 8:00 p.m. the two, along with Jeff Pritchard, went to the home of some female friends

in Martinsville, Virginia, and stayed until after 10:00 p.m. When they left the last place, defendant was arrested for drunk driving. The citation was issued at 10:33 p.m. in Martinsville, Virginia. On cross-examination, Vaughn agreed that he was an alcoholic in 1981 as well as at the time of trial, and that he was drinking heavily on the night in question. In a prior sworn statement to a grand jury Vaughn had stated that he had passed out for several hours that evening.

Curtis Adkins testified that on 4 August 1981 defendant, Mike Vaughn, and Jeff Pritchard came to his home at around 6:00 p.m. and left at around 8:30 p.m. Darlene Barnes testified that defendant, Mike Vaughn, and Jerry Pritchard came to her home on 4 August 1981 at around 9:15 p.m. and stayed a little over an hour. Ms. Barnes sister, Priscilla Chilton, corroborated her sister's testimony.

Paul Ramsey testified that he spent from 5:00 to 9:00 p.m. with Ricky Hopper on 4 August 1981. Phillip Rieson testified that Ricky Hopper arrived at the Cook Block five or ten minutes after 9:00 p.m. on 4 August 1981. Ten or fifteen minutes after Hopper arrived, police cars went by on their way to the Tilley residence. On cross-examination, Rieson admitted that he did not know exactly what time Hopper arrived, and that the police cars could have been on their way to a different destination or could have been dispatched to the scene later than 9:15 p.m.

Doris Hopper, Ricky's mother, stated that Ricky came home before 9:25 p.m. on 4 August 1981 and asked her if she had heard about Wayne Tilley getting shot. Ricky said he was going down to Cook Block to see what he could find out about the shooting. Mrs. Hopper looked at her kitchen clock, which was accurate, and said, "It's 9:25, Ricky, it is too late for you to go out." She saw him in his bed asleep at 3:30 a.m. when she got up to deliver papers.

The jury found defendant guilty of conspiracy to commit murder and murder in the first degree. Following a capital sentencing hearing, the jury found the following aggravating circumstances: defendant had been convicted previously of a felony involving the use of violence to the person, the murder was committed for pecuniary gain, and the murder was committed to hinder the enforcement of the laws. The jury found none of the five mitigating circumstances submitted. Upon finding that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty, the jury recommended a sentence of death.

STATE v. BROWN

[327 N.C. 1 (1990)]

On 22 May 1987 defendant filed a motion for appropriate relief with this Court, based on Hopper's recantation of his testimony implicating defendant and himself in the murder. Submitted with the motion as an exhibit was an affidavit signed by Hopper, dated 22 August 1986, in which Hopper affirmed that his trial testimony was false. On 16 October 1987 this Court entered an order allowing defendant's motion for appropriate relief for the limited purpose of directing the Superior Court, Rockingham County, to hold an evidentiary hearing to determine whether defendant was entitled to relief on the issue of recanted testimony pursuant to *State v. Britt*, 320 N.C. 705, 360 S.E.2d 660 (1987).

The matter was heard in Superior Court, Rockingham County, at the 15 February 1988 Criminal Session before Judge Griffin. Hopper testified that his trial testimony was false to the extent that he implicated defendant or himself in the murder of Wayne Tilley. He had no knowledge of defendant's participation in the killing. Hopper stated that he was motivated to render false testimony to avoid conviction on unrelated charges concerning a stolen truck, and that his girlfriend (later wife) Michelle pressured him to cooperate with the authorities. In addition to the funds he reported at trial, Hopper testified that while he was waiting to testify at defendant's trial, he and Michelle received free lodging and $250 to $300 per week for food and necessities. This was later reduced to $75 to $125 per week. After the trial, Hopper received a lump sum of $2,500 for relocation expenses. Michelle received a check for $5,000, which was a reward from the Governor's Office for her part in bringing evidence against defendant to light.

Hopper testified that on 20 September 1985 Agent Johnson and District Attorney Allen took him to an SBI office and told him that his earlier statement differed in several respects from the statements given by witnesses. According to Hopper, the district attorney told him what the discrepancies were, and allowed him to change his statement to cure the variations. Hopper stated that he did not change his testimony regarding the direction in which he drove the car because he thought this discrepancy would prevent defendant's conviction.

On 3 May 1988 Judge Griffin entered an order, including findings of fact and conclusions of law, denying defendant relief on the recanted testimony issue.

**STATE v. BROWN**

[327 N.C. 1 (1990)]

### JURY SELECTION ISSUES

**[1]** Defendant first assigns error to the trial court's ruling on an objection made by the State during jury voir dire. The trial court sustained objection to defendant's question to the venirepersons whether they were comfortable with the fact that it might be necessary for him to question police procedure during the trial. Defendant argues that this ruling unduly restricted his efforts to exercise his peremptory and for-cause challenges intelligently. It appears, however, that the objection was sustained due to the form of the question. Defendant soon after asked the same question in slightly different form without objection when he asked, "Is there anybody on the jury panel that feels that I should not question the police procedures, if so raise your hand." Defendant has failed to show prejudice or an abuse of discretion on the part of the trial court. *See State v. Parks*, 324 N.C. 420, 423, 378 S.E.2d 785, 787 (1989). This assignment of error is overruled.

**[2]** Defendant next contends that the trial court erred by excusing six prospective jurors for cause due to their feelings about the death penalty, without proper inquiry as to their ability to follow the law, and by not allowing defendant to question the prospective jurors. The standard for determining whether a potential juror may be excluded for cause because of his views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). The prospective jurors excluded in this case all agreed that they would automatically vote against the imposition of the death penalty regardless of the evidence, or that they would not return a capital verdict regardless of the circumstances. A statement by a prospective juror that she could never vote to impose the death penalty regardless of the evidence is, in effect, a refusal to perform one's duties as a juror in accordance with our capital sentencing statute, and is therefore sufficient to support excusal for cause under *Wainwright*. *State v. Brown*, 315 N.C. 40, 53, 337 S.E.2d 808, 819 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986). The trial court thus did not err in excusing these jurors for cause. *State v. Weeks*, 322 N.C. 152, 161, 367 S.E.2d 895, 901 (1988) (juror's indication that she could not, under any circumstances, vote to impose the death sentence sufficient to support excusal for cause under *Wainwright* standard);

*State v. Wilson,* 313 N.C. 516, 527, 330 S.E.2d 450, 458 (1985) (all prospective jurors challenged for cause due to beliefs regarding capital punishment stated that they would not vote to return a death sentence under any circumstances).

Defendant also complains that the trial court erred in refusing to allow him to conduct rehabilitative questioning before excusing jurors for cause due to their views on capital punishment. "The regulation of the manner and extent of inquiry by counsel at the voir dire rests largely in the trial judge's discretion." *State v. Reese,* 319 N.C. 110, 120, 353 S.E.2d 352, 358 (1987).

"When challenges for cause are supported by prospective jurors' answers to questions propounded by the prosecutor and by the court, the court does not abuse its discretion, at least in the absence of a showing that further questioning by defendant would likely have produced different answers, by refusing to allow the defendant to question the juror challenged."

*Id.* at 120-21, 353 S.E.2d at 358 (quoting *State v. Oliver,* 302 N.C. 28, 40, 274 S.E.2d 183, 191 (1981) (citations omitted) ). Defendant has made no showing that rehabilitative questioning would have elicited different answers from the prospective jurors. We have scrutinized the statements of these individuals. Four of the jurors declared their unqualified opposition to capital punishment, regardless of the circumstances. Two individuals stated that while they were not generally opposed to capital punishment and regarded it as a necessary law, they personally could not vote to impose a death sentence, regardless of the evidence. All the prospective jurors declared their positions unequivocally. The trial court did not abuse its discretion in refusing to allow further questioning of these individuals. *State v. Cummings,* 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990) (rehabilitative questioning not required when prospective juror has expressed unequivocal opposition to death penalty). This assignment of error is overruled.

[3] Defendant next assigns error to the trial court's refusal to give a requested preliminary instruction to the jury venire regarding the bifurcated procedures employed in capital trials, choosing instead to give the pattern jury instruction for this situation. The requested instruction is identical to the one requested in *State v. Artis,* in which we wrote:

Given the danger of distraction and prejudice and the desirability of uniform jury instructions for all trials, despite the unique features of each, we find no abuse of the trial court's discretion in relying upon the appropriate pattern jury instructions to inform the jury on voir dire [of the bifurcated nature of first-degree murder trials.]

*State v. Artis*, 325 N.C. 278, 295, 384 S.E.2d 470, 479 (1989), *judgment vacated on other grounds*, --- U.S. ---, 108 L. Ed. 2d 604 (1990). For the reasons stated in *Artis*, we find no abuse of discretion.

[4] Defendant assigns error to the trial court's denial of his motion for individual voir dire and sequestration of jurors during voir dire, but acknowledges that this Court has consistently denied relief on this basis. *See, e.g., State v. Reese*, 319 N.C. at 119-20, 353 S.E.2d at 357. Neither defendant nor the record in this case suggests that the trial court abused its discretion in denying this motion. We decline to reconsider our previous holdings on this issue, and accordingly we overrule this assignment of error.

GUILT PHASE ISSUES

[5] Defendant argues that the trial court erred in allowing the prosecutor to cross-examine a defense witness, Reid Boyd, with regard to rumors concerning defendant's guilt. Boyd testified that he had given law enforcement officials several false statements relating to his knowledge of the Tilley murder. Boyd at various times confessed to committing the murder himself, stated that he witnessed the commission of the murder by two men named Gary and Steve, and implicated defendant and Ricky Hopper in the murder. On direct examination, Boyd stated that he had no personal knowledge of the crime, and that the statements he made were based on "rumors and hearsay." On cross-examination, the prosecutor pursued this theme, eliciting Boyd's statement, "I knew something but not that it was true, just what I heard." The prosecutor then embarked on a line of questioning directed at establishing that Boyd spent time on the Cook Block, and that the rumors he heard were circulated on Cook Block after the murder. Defendant objected to this line of questioning at the beginning of the cross-examination on the basis of relevancy. The trial court overruled the objection. The cross-examination continued at length, with Boyd reiterating several times that his earlier statements to authorities were grounded in rumor and not based on his personal knowledge of the crime. The prosecutor persisted in returning to

Boyd's statement that the rumor on Cook Block was that defendant and Hopper murdered Tilley, culminating in the following exchange:

Q. And you had originally heard it was Bobby Brown and Ricky Hopper that did the killing?

A. Yes, sir.

Q. That is what you began hearing in your circle of friends over there?

A. That was the rumors, I never talked to anyone about it, but just heard about it, they were talking about it but I never got into the conversation.

Q. But that is what you heard and that is what you meant when you said that you knew something about the killing?

A. What I had heard.

Q. Brown and Hopper did it?

A. That is what I had heard.

Q. That was a week or two weeks after the killing?

A. Yes, sir.

Defendant argues that evidence that rumors were circulating after the murder that defendant and Ricky Hopper committed the murder constituted inadmissible hearsay because it was offered for the truth of the matter asserted.

We note initially that defendant objected only once to the admission of evidence as to what Boyd had heard via rumor, and that objection was based on relevancy grounds. The evidence was clearly relevant because it related to a matter elicited on direct examination. 1 Brandis on North Carolina Evidence § 42 (1988). No objection was made on hearsay grounds, and similar evidence was later admitted without objection. Although defendant argues that further objection would have been fruitless, we disagree. A timely objection made on proper grounds may well have drawn a different ruling as the prosecutor persisted in cross-examining the witness regarding this matter. The trial court ruled properly on the objection on relevancy grounds; any benefit of the prior objection was lost by the failure to renew the objection, and defendant is deemed to have waived his right to assign error to the prior admission of the evidence. *State v. Shamsid-Deen*, 324 N.C.

437, 445, 379 S.E.2d 842, 847 (1989). Defendant does not argue that admission of the evidence constituted plain error, and such an argument could not prevail in light of defendant's solicitation of Boyd's initial statement that his prior untrue statements to authorities were based on "rumor and hearsay."

[6] In a related assignment of error, defendant contends that the trial court erred in allowing the prosecutor to argue inferences arising from this evidence in his closing argument. The prosecutor argued that "the word was out" in 1981 regarding who committed the murder of Wayne Tilley. He argued in part:

> Right there, the defendant's very first witness, way back in 1981, tells you that he did not have anything to do with that murder that caused everybody to get arrested. He based his story on rumors and hearsay from the Cook Block where Ricky Hopper hung around, according to the other evidence he gave us. Ricky Hopper did not tell the authorities in 1981 what happened. The story, the story got in 1981 came through the mouth of Reid Boyd from the rumors and hearsay that he picked up in the Cook Block. I submit to you that the truth was out in 1981. It came from the wrong mouth.

Defendant notified the court prior to closing arguments: "I don't want the District Attorney arguing gossip and hearsay in the community as he elicited from cross-examining Reid Boyd." The trial court declined to rule on the matter in advance of arguments. During argument, defendant twice objected to this line of argument, and the trial court twice overruled his objections.

During a closing argument an attorney may not make arguments on the basis of matters outside the record, but may, based on "his analysis of the evidence, argue any position or conclusion with respect to a matter in issue." N.C.G.S. § 15A-1230 (1988). "[A]rgument of counsel must be left largely to the control and discretion of the presiding judge and . . . counsel must be allowed wide latitude in the argument of hotly contested cases." *State v. Monk*, 286 N.C. 509, 515, 212 S.E.2d 125, 131 (1975). In the instant case, the prosecutor's arguments represented legitimate inferences from the evidence. Boyd testified that his false statements made to the authorities were based on what he had heard of the circumstances of the murder through rumors and hearsay. This assertion was elicited by defendant on direct examination. Defendant neither raised an objection on hearsay grounds at trial nor asked for an instruction

limiting the jury's consideration of the evidence to impeachment purposes. The prosecutor's remarks were based upon "the facts in evidence and [the] reasonable inferences to be drawn therefrom." *Id.* This assignment of error is overruled.

**[7]** Defendant next objects to a series of statements made by the prosecutor during closing argument, none of which he objected to at trial. The prosecutor twice implied that defense counsel was attempting to obscure the truth from the jury. Referring to a statement the prosecution sought to introduce into evidence but which the trial court ruled inadmissible, the prosecutor stated:

> [A]nd the defendant did not want to hear that statement and under the rules of evidence you were not allowed to hear it at that time. Just like the wool they are trying to pull over your eyes about Bob Craig and that van. Trying to obscure the truth, trying to keep you from your duty and your role in this case as fact finders.

Soon thereafter, while discussing the meaning of "beyond a reasonable doubt," the prosecutor added:

> It does mean that you have the obligation to search out and find the truth and according to the standards that the Judge gives you, and that the truth has been obscured from you just as when I tried to ask Mrs. Sasserman about the earlier statement but lo and behold the defendant put Mrs. Sasserman on and the rules changed.

These remarks stood uncorrected at trial because of defendant's failure to object in a timely fashion. The remarks, while improper in that they equate an adverse ruling regarding the admission of certain evidence with an effort on defendant's part to obscure the truth, are not of the magnitude or character to require that the verdict be set aside. Improprieties during closing arguments, left unchallenged by defendant, must be gross indeed for this Court to hold that the trial court abused its discretion in not recognizing and correcting *ex mero motu* the comments regarded by defendant as offensive only on appeal. *State v. Johnson*, 298 N.C. 355, 368-69, 259 S.E.2d 752, 761 (1979).

Defendant next complains that the prosecutor argued matters outside the evidence when he argued that Ricky Hopper had not gained an untoward advantage by virtue of his plea arrangement. The prosecutor argued to the jury:

STATE v. BROWN

[327 N.C. 1 (1990)]

> [W]hat kind of deal has he got, look at it, since May he has
> been hiding, running, been protected, been terrorized, taken
> his wife, taken himself, and he had torn himself away from
> his city, his roots, and everything that he ever had and has
> not been able to work or do anything except wait for this trial.

Defendant maintains that the record is devoid of evidence that Hopper had been terrorized prior to trial, and that such an unsupported suggestion prejudiced defendant, because the jury no doubt inferred that defendant was responsible for terrorizing Hopper. While Hopper did not testify that he had been terrorized prior to trial, he did state that his plans to testify had resulted in a major disruption in his life and that of his family, and that he did not wish to relocate far away from his community. The prosecutor's isolated comment that Hopper had been terrorized, when examined in context, does not present an inference so grossly improper or so removed from the scope of the evidence that a new trial is required.

Defendant's final complaint relating to the prosecutor's closing argument stems from a suggestion that his alibi witnesses had motives to lie to protect him. The prosecutor argued, "[Y]ou saw through Ricky Hopper what Bobby Brown can do with folks that live at the farm, make them do anything that he wants to, anything he want [sic] them to, including, I submit to you, giving him an alibi." This comment was a permissible invitation to the jurors to scrutinize the testimony of the alibi witnesses for bias. It was not improper, and was far from grossly improper, especially in light of Hopper's testimony that defendant stated on the night of the murder that his alibi was "taken care of." These assignments of error are overruled.

[8] Defendant next assigns error to the trial court's admission, over objection, of Agent Johnson's statement that defendant made a telephone call from jail in which defendant said, "Listen, get in touch with Benny, that goddamn Ricky Hopper has done run his mouth." Defendant asserts that admission of this statement violated his attorney-client privilege and right to counsel under the state and federal constitutions.

Defendant's assertions have no merit. First, the attorney-client privilege covers only confidential communications made by the client to his attorney. *State v. Van Landingham*, 283 N.C. 589, 601, 197 S.E.2d 539, 547 (1973). Defendant's statement was not made to

his attorney. The most obvious interpretation of the statement is that defendant was asking a third person to get in touch with his lawyer, whose name was "Benny." Defendant testified during the sentencing hearing that the telephone call was in fact made to his mother. In addition, the statement was not made in confidence, as defendant spoke in the presence of Agent Johnson from a telephone located by the elevator in the county jail. "Communications between attorney and client are not privileged where made in the presence of a third person, not the agent of either party." *Id.* at 602, 197 S.E.2d at 547 (quoting 97 C.J.S. *Witnesses* § 290 (1957)). Defendant's statement, made in the presence of a third party to one who was not his attorney, lies outside the protection offered by the attorney-client privilege.

Neither did admission of defendant's statement violate his state or federal constitutional right to counsel. Although defendant characterizes Agent Johnson's knowledge of defendant's statement as occasioned by "surreptitious eavesdropping," the record does not support this description. Agent Johnson was with defendant when defendant placed the call from a telephone located by the elevator in a public building. The call was placed, not to defendant's attorney, but to his mother. The constitutional right to counsel is not implicated under these circumstances.

[9] Defendant next assigns error to the trial court's charge to the jury. In defining the elements of first-degree murder, the trial court omitted the portion of North Carolina Pattern Instruction — Criminal 206.10 which states that defendant formed the intent to kill "over some period of time, however short, before he acted." Because defendant did not object or except to this omission at trial, we must determine whether the oversight amounted to plain error. We are unpersuaded that absent the error the jury would have reached a different verdict, and thus that the incomplete instruction constituted plain error. *See State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986). The State's evidence tended to show a contract between defendant and Lindley Tate for the murder of Wayne Tilley. Ricky Hopper testified that defendant first solicited his help with the murder on 1 August 1981. On 4 August 1981, defendant told Hopper they would leave shortly before 9:00 p.m. because Tilley always checked his mailbox at approximately 9:15 p.m. before going to work. Defendant loaded a double-barreled sawed-off shotgun and brought it with him in the car to ride to Tilley's home. Defendant told Hopper, the driver, to slow his speed as

they approached the Tilley home, and if other people were around, to drive on by. Defendant proceeded to shoot the victim outside his home as planned. At trial defendant did not attempt to establish that he shot Tilley in an unpremeditated manner. Rather, his defense, presented by the testimony of several alibi witnesses, was total innocence. Under these facts, the failure to elucidate the meaning of premeditation did not constitute plain error. The evidence presented no issue as to defendant's state of mind or the existence of a calculated plan to kill Tilley, but called for a determination as to the credibility of the State's witnesses versus that of defendant's alibi witnesses. The jury's verdict demonstrates its belief that Ricky Hopper testified truthfully regarding the existence of a premeditated plan, and execution of said plan, to kill Wayne Tilley. The jury's conviction of defendant on the charge of conspiracy to commit murder further demonstrates its belief that defendant planned the crime in advance of its execution, and convinces us that additional instructions on the element of premeditation would have had no effect on the jury's verdict. *See State v. Dixon*, 321 N.C. 111, 114, 361 S.E.2d 562, 564 (1987) (no plain error in charge on premeditation and deliberation). This assignment of error is overruled.

[10] Defendant assigns error to the trial court's instruction to the jury on proximate cause and premeditation and deliberation. He complains of the italicized passages in the following instructions:

[T]he State must prove that *the shooting* was a proximate cause of the victim's death. A proximate cause is a real cause, a cause without which Clarence Wayne Tilley's death would not have occurred.

* * *

Neither premeditation nor deliberation are usually susceptible of direct proof. They may be proved by circumstances from which they may be inferred, such as the lack of provocation by the victim, the conduct of the defendant before, during, and after the killing, declarations of the defendant, *use of grossly excessive force. Brutal or vicious circumstances of the killing. The manner in which or the means by which the killing was done.*

Defendant argues that these instructions failed to distinguish between the acts of defendant and those of Ricky Hopper, and thus

STATE v. BROWN

[327 N.C. 1 (1990)]

could have allowed the jury to convict defendant on the basis of Hopper's acts rather than his own. Again, because defendant did not object or except at trial, appellate review is confined to plain error analysis.[1] When viewed in context, it is clear that these instructions do not rise to the level of plain error. The jury charge, when viewed as a whole, is replete with instructions directing the jury's consideration to defendant's acts alone. A few examples suffice:

> Now I charge for you to find the defendant guilty of first degree murder the State must prove five things beyond a reasonable doubt. First, that *the defendant* intentionally and with malice killed the victim . . . . Third, that *the defendant* intended to kill the victim. . . . Fourth, that *the defendant* acted with premeditation, that is that *he* formed the intent to kill the victim; and fifth, that *the defendant* acted with deliberation . . . .

(Emphases added.) The jury received satisfactory instructions, viewed contextually, directing its attention to the acts of defendant alone. This assignment of error is overruled.

[11] Defendant also assigns error to the trial court's failure to instruct on an acting in concert theory. Such an instruction was not requested at trial.[2] Defendant argues that because the prosecutor pursued an acting in concert theory in his closing argument, the jury was left uninformed as to how to apply the doctrine. The portion of the argument to which defendant refers, and which occasioned no objection at trial, is as follows:

---

1. Although defendant contends in his brief that he specifically requested an instruction requiring the jury to find that defendant's own acts were the cause of Tilley's death, and that defendant personally acted with premeditation and deliberation, no such request appears in the record. At the charge conference, the trial court scrupulously detailed the instructions it intended to give and invited additions or corrections by counsel. None were offered. Following the jury charge, before the jury began deliberations, the trial court again asked for counsel's corrections, and none were offered. Defendant cites to a page in the record which is headed "Statement of Omitted Instructions." Nothing in the record substantiates that these instructions were submitted to the trial court prior to its charge to the jury; indeed, it appears that these "omitted instructions" were the product of hindsight and were inserted during the compilation of the record. Accordingly, this assignment of error is subject to the plain error rule.

2. Defendant asserts in his brief that he specifically requested an acting in concert instruction. Our careful examination of the record reveals no such request before, during, or after the charge conference.

The doctor told you . . . that there are two buck shots, like Ricky said, and that he had massive internal injuries. Massive. Either one of which would have caused instant death, if you have any doubt in your minds which of the two shots killed Wayne Tilley. It does not matter. Two persons acting in concert under the laws of North Carolina would both be equally guilty but if you ever get in your mind there is any lesser degree of involvement in who killed him the doctor cleared that up. He said either one of them would have killed him, but the law of North Carolina makes all equally guilty either way.

The prosecutor did argue an acting in concert theory to the jury. However, the absence of an acting in concert instruction could only have inured to defendant's benefit. Had the trial court instructed the jury in accordance with the North Carolina Pattern Instruction on acting in concert — that if two persons act together with a common purpose to commit a crime, each is responsible for the acts of the other — defendant could have been convicted of murder on the basis of Ricky Hopper's acts. *See* N.C.P.I. Criminal 202.10. This is the very defect of which defendant complained in his preceding assignment of error. As discussed above, the charge provided ample direction to the jury to consider only defendant's acts when determining his guilt or innocence on the murder charge.

Assuming error, no plain error exists because the evidence led inexorably to one of two conclusions: that defendant was in Virginia when Tilley was killed, and thus could not be guilty, or that both defendant and Hopper fired fatal shots at the victim. The jury having fulfilled its role as fact finder and made the determination that defendant fired one of two fatal shots at the victim, we see no probable impact on the jury's verdict by the absence of an acting in concert instruction. *See State v. Walker*, 316 N.C. at 39, 340 S.E.2d at 83.

ISSUES RELATING TO DEFENDANT'S MOTION
FOR APPROPRIATE RELIEF

[12] Defendant contends that Judge Griffin erred in denying his motion for appropriate relief, arguing that he misapplied the law relating to recanted testimony, placed unwarranted weight upon the jury's verdict, and entered numerous findings of fact unsupported by the evidence. We first address the court's application of the law relating to recanted testimony.

A defendant may be allowed a new trial on the basis of recanted testimony if:

1) the court is reasonably well satisfied that the testimony given by a material witness is false, and

2) there is a reasonable possibility that, had the false testimony not been admitted, a different result would have been reached at the trial.

State v. Britt, 320 N.C. 705, 715, 360 S.E.2d 660, 665 (1987). See Annot. "New Trial—Recantation," 88 A.L.R.4th 1031 (1990). The order includes conclusions of law stating, "Without the testimony of Ricky Hopper at the defendant's trial, the State would have been unable to obtain a conviction," and "the Court is not reasonably well satisfied that the trial testimony of Ricky Hopper was false." The hearing judge thus denied defendant's request for a new trial on the basis of the first prong of the Britt test.

Defendant argues that the evidence compelled a contrary finding. He cites cases in which a recantation by a pivotal witness necessitated a new trial. We find these cases distinguishable.

In State v. Ellers, 234 N.C. 42, 65 S.E.2d 503 (1951), the witness requested permission to return to the stand after the verdict but before the sentences were imposed. This was allowed, and the witness repudiated his testimony implicating the defendant in the crime of receiving stolen property. The trial court nevertheless denied defendant's motion to set aside the verdict, and this Court reversed the judgment and ordered a new trial. The recantation in Ellers took place before the trial court entered the sentence. Hopper's recantation here, by contrast, occurred approximately a year after trial and followed a brush with the law which resulted in the revocation of his parole. The cases thus are distinguishable, and Ellers did not require the granting of defendant's motion.

The remaining cases cited by defendant are rape cases from other jurisdictions, in which the victim recanted her testimony after trial. See, e.g., Commonwealth v. Mosteller, 446 Pa. 83, 284 A.2d 786 (1971). These cases are entirely distinguishable because the recanting witness was the victim of the crime, rather than a cofelon as here. A recantation by a convicted codefendant involving a confession of perjury is "exceedingly unreliable." State v. Shelton, 21 N.C. App. 662, 665, 205 S.E.2d 316, 318, cert. denied, 285 N.C. 667, 207 S.E.2d 760 (1974).

STATE v. BROWN

[327 N.C. 1 (1990)]

We disagree with defendant's contention that the evidence compelled a ruling in his favor. Among the conclusions of law made by the hearing judge are the following, which support his ultimate conclusion that he was not reasonably well satisfied that Hopper's trial testimony was false:

3. Hopper's implication of himself in the actual shooting of Tilley is powerfully compelling on the question of his trial credibility.

5. There was no reason, except conscience, for Ricky Hopper to implicate himself or Brown in the Tilley murder, as he was well aware that the State had no case against either of them unless he told the State what happened.

6. There were, in fact, substantial and compelling reasons for Hopper not to testify at the defendant's trial, unless his testimony was true.

7. There now exist substantial and compelling reasons for Hopper to recant his trial testimony, reasons which do not affect the truthfulness or credibility of that witness.

As to defendant's argument that the court erred by placing unwarranted weight upon the jury's verdict, which credited Hopper's testimony, we note that the hearing judge made the following conclusion of law: "2. The jury had a full and fair opportunity to hear and weigh the discrepancies in Hopper's various statements, the reasons for those discrepancies, and to consider and weigh the credibility of Hopper's testimony at trial." Defendant argues both that the jury did not have a full opportunity to weigh Hopper's credibility, and that the jury's decision to credit Hopper's testimony is not a relevant factor under the Britt analysis. It is true that Hopper testified to additional information at the hearing regarding the circumstances surrounding his several pretrial statements. This information pertained to the pressure brought to bear upon Hopper by his wife, Michelle, the amount of money expended by the SBI and FBI to maintain Hopper and his family before defendant's trial and to relocate them after the trial, and alleged suggestions made to Hopper by the district attorney regarding how Hopper should change his statement to conform to those of other witnesses. The hearing judge found as a fact that "[t]he events which led to Hopper's inconsistent statements and his trial testimony were in substance before the jury which returned and [sic] guilty verdicts

against Bobby Ray Brown," and "[a]lthough Hopper testified at trial he had no formal plea agreement, the facts of Hopper's understanding with State about his relocation, the payments which had been made therefore [sic] and which were to be made were in substance before the jury." These findings of fact are supported by the evidence, and thus are binding on appeal. *State v. Baker*, 312 N.C. 34, 40, 320 S.E.2d 670, 675 (1984); *State v. Stevens*, 305 N.C. 712, 719-20, 291 S.E.2d 585, 591 (1982).

As to defendant's argument that the jury's belief of Hopper's trial testimony is irrelevant to the *Britt* inquiry, we disagree in the context presented by this case. The hearing judge's consideration of the jury's belief of Hopper was limited to his determination whether the additional information tending to show Hopper's bias impacted on defendant's request for a new trial. Because most, if not all, of the details of Hopper's arrangements with the State were before the jury, the hearing judge properly considered and rejected defendant's arguments that the additional information tended to discredit Hopper's trial testimony, thus bolstering his recantation of his trial testimony.

Defendant contends that the denial of his motion was based upon findings of fact, thirteen of which were unsupported by the evidence. We have carefully reviewed the findings, the record, the transcripts, and defendant's arguments, and we hold that the findings were supported by the evidence. Findings of fact made on a motion for appropriate relief are binding on appeal if supported by the evidence, even though the evidence may be conflicting. *State v. Baker*, 312 N.C. at 40, 320 S.E.2d at 675; *State v. Stevens*, 305 N.C. at 719-20, 291 S.E.2d at 591. The assignments of error relating to this issue are overruled.

[13] Defendant next assigns error to the hearing judge's denial of his motion to amend the motion for appropriate relief. By this motion defendant sought to assert, as an additional ground for the hearing judge's consideration of whether defendant was entitled to a new trial, the State's alleged withholding from defense counsel of a statement made by Sharon Tobin. The hearing judge denied the motion to amend on the basis of N.C.G.S. § 15A-1418(a)[3] and

---

3. The statute provides in part: "When a case is in the appellate division for review, a motion for appropriate relief based upon grounds set out in G.S. 15A-1415 must be made in the appellate division." N.C.G.S. § 15A-1418(a) (1988).

on the basis of the language in this Court's order allowing defendant's original motion for appropriate relief "for the limited purpose of . . . hold[ing] an evidentiary hearing on the recanted testimony issue . . . ." Following the hearing on the issue of Hopper's recanted testimony, during which the judge denied defendant's motion to amend, defendant filed a second amended motion for appropriate relief with this Court based on the statements of Sharon Tobin and an additional witness, Tamara Smith. This Court denied the motion and defendant does not assign error to that order.

The allegedly exculpatory evidence proffered by defendant at the hearing consisted of statements given to law enforcement officers by Sharon Tobin, who told officers she witnessed the shooting. Defendant makes much of Ms. Tobin's statement that the car from which the shots were fired drove off facing south toward Aiken Road, rather than north toward Friendly Road as Hopper testified at trial. Ms. Tobin's statement corroborated that of Nancy Sasserman, who testified at trial that the vehicle from which the shots were fired was headed south. However, we disagree with defendant's premise that this evidence tended to exonerate him. The materiality of nondisclosed evidence " 'hinges on two factors: (1) the strength of the evidence itself vis-a-vis the issue of guilt and (2) the magnitude of the evidence of guilt which the convicting jury heard.' " *State v. Artis*, 325 N.C. at 333, 384 S.E.2d at 502 (quoting *State v. McDowell*, 310 N.C. 61, 71, 310 S.E.2d 301, 308 (1984), *vacated on other grounds sub nom. McDowell v. Dixon*, 858 F.2d 945 (4th Cir. 1988) ). We consider the proffered evidence to bear only remotely, if at all, on the issue of defendant's guilt. No evidence suggests that defendant and Hopper were at the murder scene travelling north, while an unknown vehicle travelling south propelled the murderer away from the victim. The evidence suggests either that defendant and Hopper committed the murder, or that defendant was in Virginia at the time of the killing. Regarding the magnitude of the evidence of defendant's guilt, the jury heard eyewitness testimony by Hopper that defendant planned and executed a contract killing. We do not believe there is a reasonable possibility that pretrial disclosure of the corroborative evidence disputing the direction in which the escape vehicle travelled would have affected the outcome of the trial. *Id.* The moving party bears the burden of proving by a preponderance of the evidence every fact essential to support his motion. "Giving imaginative reign to what the [additional evidence] might imply is far from bearing this burden." *Id.* at 334, 384 S.E.2d at 502.

In addition, Judge Griffin permitted defendant to offer Ms. Tobin's statements into evidence at the post-conviction hearing so he could consider how the statements reflected on the recanted testimony issue. Defendant asserts in his brief that the interests of justice required that Ms. Tobin's statement be considered together with the issue of Hopper's recanted testimony. It appears that this precise relief was afforded defendant at the hearing. This assignment of error is overruled.

[14] Finally, defendant contends that the hearing judge erred in allowing cross-examination of Hopper regarding a letter allegedly written by Hopper to his wife admitting his guilt in the Tilley murder. Hopper denied writing the letter and stated that his wife could have written it. In his order denying the motion for appropriate relief, Judge Griffin wrote: "The Court has not considered any evidence elicited by the State about a letter allegedly written by Ricky Hopper to Michelle Hopper, nor has such evidence had any influence on the Findings or Conclusions rendered herein." Defendant accordingly can demonstrate no prejudice resulting from the introduction of this evidence. This assignment of error is overruled.

SENTENCING PHASE

[15] Following a capital sentencing hearing, the jury found three aggravating circumstances — prior conviction of a violent felony, commission for pecuniary gain, and commission to hinder law enforcement — but rejected all five mitigating circumstances submitted. A requirement that the jurors unanimously find the existence of mitigating circumstances was incorporated in both the trial court's verbal instructions to the jury and on the written issue sheet submitted for the jury's use during sentencing deliberations. Defendant assigns error to the trial court's having required that the jurors find the existence of mitigating circumstances unanimously, citing *Mills v. Maryland*, 486 U.S. 367, 100 L. Ed. 2d 384 (1988). We have previously resolved this issue, as a matter of state law, contrary to defendant's position. *State v. Kirkley*, 308 N.C. 196, 302 S.E.2d 144 (1983), *overruled on other grounds*, *State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988). We reconsidered our position in light of *Mills v. Maryland* in *State v. McKoy*, 323 N.C. 1, 372 S.E.2d 12 (1988), *death sentence vacated, case remanded*, 494 U.S. ---, 108 L. Ed. 2d 369 (1990), and reaffirmed the position

that "[o]ur capital-sentencing procedure ... provides a proper balance between individualized sentencing and guided discretion and therefore . . . conforms with federal constitutional requirements." 323 N.C. at 43, 372 S.E.2d at 35. In *McKoy v. North Carolina*, 494 U.S. ---, 108 L. Ed. 2d 369 (1990), the United States Supreme Court disagreed with our conclusion that certain differences between the Maryland and North Carolina capital sentencing statutes distinguished *Mills* from *McKoy*, stating that "North Carolina's unanimity requirement impermissibly limits jurors' consideration of mitigating evidence and hence is contrary to our decision in *Mills.*" *McKoy v. North Carolina*, 494 U.S. at ---, 108 L. Ed. 2d at 381.

In *State v. McKoy*, 327 N.C. 31, 394 S.E.2d 426 (1990), we concluded that harmless error analysis is applicable to cases containing *McKoy* error. In the present case, however, we are unable to conclude that submission of the unanimity instruction was harmless beyond a reasonable doubt. Defendant submitted the following five mitigating circumstances to the sentencing jury: whether defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired; whether the defendant is a person of limited intellect and education and whether this has mitigating value; whether the defendant suffered a blow to the head at age thirteen which caused him to suffer brain damage and whether this has mitigating value; whether defendant was convicted by the testimony of an accomplice and whether this has mitigating value; and any other circumstance(s) arising from the evidence which the jury deems to have mitigating value. There was evidence to support at least some of the mitigating circumstances submitted, yet the jury found none of the circumstances. Because we cannot conclude that the unanimity requirement did not affect at least one juror's vote and thus the jury's sentencing recommendation, we set aside the sentence of death and remand for a new capital sentencing hearing. We thus need not address defendant's remaining sentencing phase assignments of error.

We conclude that defendant received a fair trial, free from prejudicial error, and that his motion for appropriate relief was properly denied. Because we find prejudicial error in the capital sentencing phase under the United States Supreme Court's decision in *McKoy v. North Carolina*, we remand to the Superior Court, Rockingham County, for a new sentencing hearing on the first-degree murder conviction.

First-degree murder: Guilt Phase, no error; remanded for new capital sentencing proceeding.

Conspiracy to commit murder: No error.